NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190667-U

NO. 4-19-0667

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 23, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| SAMUEL SAULS, | ) | No. 18CF1153 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, concluding (1) the State presented sufficient
evidence to sustain defendant's conviction, (2) the trial court did not err in
quashing his subpoena to DCFS without first reviewing *in camera* the requested
records, and (3) defendant forfeited his claim the court's *voir dire* examination
violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 2     A jury found defendant, Samuel Sauls, guilty of one count of predatory criminal

sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)), and the trial court sentenced

him to twenty years' imprisonment. Defendant appeals, arguing (1) the State failed to prove him

guilty beyond a reasonable doubt, (2) the trial court erred in quashing his subpoena requesting

records from the Department of Children and Family Services (DCFS) without first reviewing

*in camera* the requested records, and (3) the court's *voir dire* examination violated Illinois

Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm.

¶ 3                                I. BACKGROUND

¶ 4                               A. The Charges

¶ 5        The State charged defendant by information with two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)). Because the jury acquitted defendant of count II involving J.G.P., we discuss only the facts relevant to count I relating to L.G.P., J.G.P.'s sister. Count I alleged that "on or about August of 2017, *** defendant, who was 17 years of age or older, committed an act of contact, however slight, between [his] sex organ *** and the hand of [L.G.P.], who was under 13 years of age when the act was committed, and was for the purpose of sexual gratification or arousal ***."

¶ 6                              B. Pretrial Motions

¶ 7                         1. *The State's Section 115-10 Motion*

¶ 8        Prior to trial, the State filed a motion to allow out-of-court statements by L.G.P. into evidence under section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2018)). The trial court granted the motion after a hearing.

¶ 9                        2. *Defendant's Motion for Discovery*

¶ 10        In March 2019, defendant filed a supplemental motion for discovery pursuant to Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001). Defendant requested documents pertaining to a DCFS investigation into allegations of abuse lodged against L.G.P.'s mother, Mercedes, and Angel Walker, "the live-in girlfriend of Mercedes ***." The record does not reflect the nature of the alleged abuse or the identity of the victim or victims. At a hearing on the motion, the State asserted DCFS refused to turn over the requested records. The court responded, "we'll do a subpoena *duces tecum* for that report."

¶ 11 Defendant subsequently served a subpoena *duces tecum* on DCFS for "[a]ll records of investigations" related to Mercedes or Walker. DCFS, through the Attorney General, moved to quash the subpoena. In its motion to quash, DCFS asserted the subpoena sought information contained in an "unfounded DCFS report," which was "confidential and inadmissible" under the Abused and Neglected Child Reporting Act (Reporting Act). See 325 ILCS 5/7.14 (West 2016) (providing unfounded reports are inadmissible in all judicial proceedings except under limited circumstances not relevant here). Alternatively, DCFS indicated it would comply with an order to produce a "redacted copy of the investigation" for *in camera* review.

¶ 12 The trial court conducted a hearing on the motion to quash. Defendant made the following argument against quashing the subpoena:

"MISS WYMAN [(DEFENSE COUNSEL)]: [DCFS] want[s] to quash this essentially claiming that it is—well, that it is seeking unfounded DCFS reports. I understand that and think that's accurate, that it's unfounded, but I—the information could be relevant in several ways in this trial. Certainly showing interest and bias of one of the—well, the mother of the accuser and her girlfriend, both of which defense, based on our research believes—well, it goes to interest and bias of the—of the mother of the children who allegedly made these or who made these allegations, and her girlfriend who we believe are playing a part in— in this, and that goes to not only interest and bias, but if there's contradictory statements, that would certainly be *Brady* material as well."

The State responded the Reporting Act made clear that unfounded reports were confidential, and it contained no provision allowing for disclosure to criminal defendants for the purpose of

impeaching a State witness. The court agreed with the State and granted the motion to quash without reviewing *in camera* the requested records.

¶ 13                                    C. Jury Trial

¶ 14        Defendant's jury trial began on July 29, 2019, and concluded on August 1, 2019.

¶ 15                              1. *Voir Dire Examination*

¶ 16        During *voir dire*, the court separated the venire into three groups and admonished each group regarding the principles enumerated in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), as follows:

> "THE COURT: All right. For Jurors No. 72, 89, 12, and 31, the four of you understand that the Defendant is presumed to be innocent of the charges against him, that before the Defendant can be convicted the State must prove him guilty beyond a reasonable doubt, that the Defendant is not required to offer any evidence on his own behalf and if the Defendant does not testify that fact cannot be held against him in any way? The four of you understand those instructions; is that correct?
>
> [PROSPECTIVE JURORS:] (Jurors respond affirmatively.)
>
> THE COURT: And they answer in the affirmative. And the four of you accept those instructions; is that correct?
>
> [PROSPECTIVE JURORS:] (Jurors answer affirmatively.)"

¶ 17                              2. *Evidence Presented*

¶ 18                                    a. Francisco G.

¶ 19        Francisco G., who is L.G.P.'s father and Mercedes's husband, testified that in August 2017, he attended a birthday party for defendant's daughter and L.G.P.'s cousin, N.S.,

who was turning three years old. "All the family members" were at the party. This included Desiree P., who is defendant's wife and Mercedes's sister, and Rose P., who is L.G.P.'s grandmother and Mercedes's mother.

¶ 20    Francisco testified defendant called Mercedes after the party to invite L.G.P. and her younger sister, J.G.P., to his house for a sleepover with N.S. Francisco and Mercedes dropped off the two children at defendant's house around 10 p.m. They picked up the girls the following morning, and L.G.P. told them "she didn't want to go back [to defendant's house]." When Francisco asked why, "she just looked down *** but she didn't say—she wouldn't say why."

¶ 21                                    b. L.G.P.

¶ 22    L.G.P. (born September 7, 2009), testified that she stayed the night at defendant's house in August 2017 because it was N.S.'s birthday and she wanted to spend the night with her. L.G.P. thought her grandmother dropped her off, but she was not certain. L.G.P. testified she fell asleep watching a movie in defendant's bedroom along with J.G.P., N.S., and defendant. L.G.P. and J.G.P. were on the floor, while defendant and N.S. were on defendant's bed. At some point during the night, L.G.P. and J.G.P. ended up in defendant's bed, but she did not know how. When L.G.P. later awoke in defendant's bed in the middle of the night, she initially thought she was holding her fingers but realized defendant's "private" was in her hand. She stated defendant "was just laying down right there and just on his phone I think." She thought defendant was wearing a T-shirt and nothing else. L.G.P. testified her hands were "sticky" so she went to the bathroom to wash them and then went back to sleep. L.G.P. did not tell her mother about the incident right away because she was scared defendant would get mad at her mother. On cross-examination, she said she could not remember the color of the sheets or the number of

pillows on the bed. When asked if she remembered telling someone defendant's hands were under his head and not holding his phone, L.G.P. responded, "I don't know if he had a phone or not, but I think he did [because], like—I can't really remember that good. I could just remember, like, the bedroom stuff and, like, what happened."

¶ 23                                    c. Mercedes G.P.

¶ 24          Mercedes G.P., L.G.P.'s mother and defendant's sister-in-law, testified defendant called her the day after N.S.'s birthday party to invite L.G.P. and J.G.P. to a sleepover at his house with N.S. Mercedes and Francisco dropped the girls off at defendant's house later that day and picked them up during the early afternoon of the following day. Mercedes testified the girls were quiet in the car but neither of them made any disclosures on the drive home. According to Mercedes, L.G.P. told her "a couple days later" that she did not "ever want to spend the night with [defendant] again." Mercedes asked why, and L.G.P. explained she woke up with defendant's finger in her hand and then asked to use the bathroom to wash her hands. L.G.P. further explained defendant was not wearing a shirt or boxers. Mercedes then asked if anything felt "not normal" to her or if she had been touched, but L.G.P. said no.

¶ 25          Mercedes testified that on May 30, 2018, she had a family gathering at her house and N.S. attended. Mercedes's brother wanted to meet defendant, so she told her brother that he had to meet him on the street because she did not want defendant near her house. L.G.P. later saw N.S. getting into defendant's car and told Mercedes: "Mama, please. Don't let her go with him [because] he's going to do what he did to me. It wasn't his finger, *** it was his private part." After this disclosure, Mercedes scheduled a doctor's appointment for L.G.P.

¶ 26                                    d. Dr. Mary Buetow

- 6 -

¶ 27        Dr. Buetow, a licensed pediatrician specializing in child abuse and neglect, testified she met with L.G.P. and Mercedes on June 26, 2018. Dr. Buetow and a clinical social worker interviewed L.G.P. in an exam room outside the presence of her mother. During the interview, L.G.P. explained that she had stayed the night with defendant because she wanted to have a sleepover with N.S. L.G.P. told Dr. Buetow she slept in the same room as N.S., J.G.P., and defendant; L.G.P. and defendant slept in the bed, while J.G.P. and N.S. slept on a "pallet" on the floor. L.G.P. continued: "[W]hen I woke up I thought I was holding [defendant's] finger, but it wasn't his finger. It was his private part. It was his penis, and my hand was wet so I got up and went to the bathroom and washed my hand." Dr. Buetow reported the allegations to DCFS "because of [her] concerns ***."

¶ 28                            e. Chad Turner

¶ 29        Chad Turner, a child protective investigator for DCFS, testified that he conducted a forensic interview with L.G.P. at the Children's Advocacy Center (CAC) on July 17, 2018. The interview was recorded. The recording was admitted into evidence and played for the jury.

¶ 30        In her CAC interview, L.G.P. stated that she spent the night at defendant's house after N.S.'s birthday party. L.G.P. said there was a bed and a pallet in defendant's room, and she slept on the bed. She later said that she fell asleep on the pallet but woke up in the bed. In describing the relevant event, L.G.P. stated, "I was lying down, and I thought I was holding his finger, and I woke up and it was his private. So, I said, 'can I go to the bathroom?' I went to the bathroom and washed my hands. I came back and laid down." L.G.P. explained that she washed her hands because they were "like wet kind of." L.G.P. said defendant was wearing a shirt but "his underwear was pulled down." She also stated that defendant was "laying on his hands."

Turner asked L.G.P. to indicate on an anatomical diagram which part of defendant's body was in her hand. L.G.P. pointed to the penis.

¶ 31　　　　On cross-examination, Turner acknowledged that defendant's wife, Desiree, had told him about a "physical altercation" between defendant and Mercedes that occurred shortly before L.G.P. "started to appear to be afraid of [defendant]." However, Turner testified that this did not give him cause to believe "the kids had been coached." Following Turner's testimony, the State rested.

¶ 32　　　　　　　　　　　　　　f. Rose P.

¶ 33　　　　Rose P., L.G.P. and N.S.'s grandmother and defendant's mother-in-law, testified that N.S. and Desiree had lived with her since early 2017. Rose attended N.S.'s birthday party in 2017 and dropped off clothes for her at defendant's house the next day. According to Rose, N.S. was the only child present. Rose stated that defendant had a positive relationship with L.G.P. and J.G.P. She explained the girls were "always glad" to see defendant and he would "pick them up and hug them and put them down."

¶ 34　　　　Rose testified that over the Memorial Day weekend in 2018, Mercedes and her friend, Angel Walker, were at her house with L.G.P. and other family members. Rose left briefly and when she returned, "everyone was hollering." Rose walked up to the porch, "and that's when [L.G.P.] was standing on the porch and Angel was to the side and she was, like, and what's next, [L.G.P.] Tell them, [L.G.P.] Tell them what's next, and she kept doing that over and over." Rose testified that she did not see L.G.P. and J.G.P. as frequently after this event.

¶ 35　　　　　　　　　　　　　　g. Desiree P.S.

¶ 36　　　　Desiree testified that she had been separated from defendant since 2015. Desiree attended N.S.'s birthday party in 2017, and she said N.S. stayed with defendant for a few days

after the party. In March or April 2018, Desiree and defendant "weren't on the best of terms" due to a tax dispute in which defendant claimed N.S. as a dependent even though she lived with Desiree. As a result, Desiree stopped allowing defendant to see N.S.

¶ 37 On one occasion during this time period, defendant showed up at Desiree's house and asked to see N.S. N.S. was outside at the time, so Desiree picked her up and took her inside. While Desiree was doing this, Mercedes "got in front" of defendant and told him he could not see N.S. When asked if "anything physical" happened, Desiree testified, "It was pretty much he was walking forward. She tried to, like, push him—push him back. *** She pushed him back, and he was just like—he kind of yelled, like, I want to see my daughter ***." Desiree further testified that L.G.P. and J.G.P. witnessed the altercation and they were shocked by it.

¶ 38 Desiree and defendant later resolved the tax dispute, and defendant began coming over more often to pick up N.S. Desiree testified she never observed L.G.P. exhibit any signs of "fear or reticence" towards defendant. On cross-examination, Desiree said that she was not at defendant's house after N.S.'s birthday party so she did not know if L.G.P. and J.G.P. stayed overnight at defendant's house.

¶ 39                                    h. Defendant

¶ 40 Defendant testified that N.S. stayed with him after her birthday party but L.G.P. and J.G.P. did not. According to defendant, the last time any of his nieces stayed overnight at his house was in the summer of 2017 before school started. Defendant testified that when his nieces did stay overnight, they would sleep in his bedroom and he would sleep on the couch in the living room. He asserted he had never set up a pallet for them and they had never slept on the floor at his house. Defendant also stated he had not shared a bed with his nieces since they were "in diapers." Defendant testified he did not put his penis in L.G.P.'s hand.

¶ 41                                    3. *Finding of Guilt*

¶ 42            The jury found defendant guilty of count I beyond a reasonable doubt.

¶ 43                                    D. Posttrial Proceedings

¶ 44            Defendant filed a timely posttrial motion, arguing, in relevant part, the State failed

to prove him guilty beyond a reasonable doubt and the court erred in quashing his subpoena

*duces tecum*. The trial court denied defendant's motion and subsequently sentenced him to 20

years' imprisonment.

¶ 45            This appeal followed.

¶ 46                                    II. ANALYSIS

¶ 47            Defendant argues (1) the State presented insufficient evidence to prove him guilty

beyond a reasonable doubt, (2) the trial court deprived him of his right to material evidence by

quashing his subpoena *duces tecum* without first reviewing *in camera* the requested records, and

(3) the court's *voir dire* examination violated Illinois Supreme Court Rule 431(b) (eff. July 1,

2012).

¶ 48                                    A. Sufficiency of the Evidence

¶ 49            Defendant argues the evidence was insufficient to sustain his conviction for

predatory criminal sexual assault of a child because the State failed to prove he committed an act

of contact between his penis and a part of L.G.P.'s body. In support of his argument, defendant

points to a lack of detail and inconsistencies in L.G.P.'s various statements, as well as a conflict

in the testimony of Mercedes and Francisco. Defendant also highlights his "history of animosity"

with Mercedes to imply Mercedes coached L.G.P. to accuse him of sexual assault.

¶ 50            When reviewing the sufficiency of the evidence, the question is "whether, after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A court of review "will not substitute its judgment for that of the trier of fact on issues of the weight of evidence or the credibility of witnesses." *People v. Cooper*, 194 Ill. 2d 419, 431, 743 N.E.2d 32, 40 (2000). "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *People v. Sutherland*, 223 Ill. 2d 187, 242, 860 N.E.2d 178, 217 (2006). We will not set aside a conviction on appeal "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276 (1985).

¶ 51          Here, the question is whether, after viewing the evidence in the light most favorable to the State, any rational juror could have found defendant committed an act of contact between his penis and a part of L.G.P.'s body beyond a reasonable doubt. L.G.P. testified that at some point during the sleepover at defendant's house, she woke up in his bed thinking she was holding her fingers but realized it was defendant's "private." She further testified her hands were "sticky" so she went to the bathroom to wash them. Mercedes and Dr. Buetow testified L.G.P. gave them the same account she gave at trial. Additionally, L.G.P.'s description of the incident during her CAC interview mirrored her testimony at trial. This evidence was sufficient to sustain defendant's conviction. See, *e.g.*, *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228, 920 N.E.2d 233, 243 (2009) ("It remains the firm holding of this court that the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant.").

¶ 52          We find defendant's argument to the contrary unpersuasive. As noted above, in challenging the sufficiency of the evidence, defendant points to (1) a lack of detail and

inconsistencies in L.G.P.'s various statements, (2) conflicting testimony between Mercedes and Francisco, and (3) his "history of animosity" with Mercedes.

¶ 53    Although L.G.P. could not recall certain details about the event in question, and minor inconsistencies appeared in her various statements, these were factors for the jury, not this court, to weigh and resolve. See *Sutherland*, 223 Ill. 2d at 242 ("The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact."). Further, L.G.P. was seven years old at the time and had just awoken in the middle of the night, making it reasonable to believe she would not remember every detail surrounding the event—an event that occurred two years prior to her testimony. As for defendant's second contention, again, it was for the jury to consider and resolve the conflict in Francisco's and Mercedes's testimony regarding L.G.P.'s initial disclosure. See *id.* As for defendant's third contention, regarding his hostile relationship with Mercedes, we find it also fails to raise a reasonable doubt of his guilt. Defendant points to his contentious relationship with Mercedes and implies she coached L.G.P. to make a false accusation against him. While a reasonable juror could arguably draw this conclusion, it certainly is not the *only* reasonable conclusion that could be drawn. A juror could just as reasonably conclude the hostility between the two played no role in L.G.P. making these allegations. We will not draw a contrary inference in favor of defendant on review. See *People v. Cunningham*, 212 Ill. 2d 274, 280, 818 N.E.2d 304, 308 (2004) ("[I]f only one conclusion may reasonably be drawn from the record, a reviewing court must draw it even if it favors the defendant."). Accordingly, for the reasons discussed, we find the evidence was sufficient to sustain defendant's conviction for predatory criminal sexual assault of a child.

¶ 54                    B. Motion to Quash Subpoena *Duces Tecum*

¶ 55        Defendant next argues the trial court deprived him of his constitutional right to

material evidence by quashing his subpoena *duces tecum* to DCFS. Citing *Pennsylvania v.*

*Ritchie*, 480 U.S. 39 (1987), and *People v. Escareno*, 2013 IL App (3d) 110152, 982 N.E.2d 277,

defendant asserts the court was obligated to review the requested records *in camera* and disclose

any evidence it deemed material to his defense. The State maintains that because section 7.14 of

the Reporting Act (325 ILCS 5/7.14 (West 2016)) makes unfounded reports statutorily

privileged, the information defendant seeks is inadmissible and, by extension, necessarily

immaterial. The State further contends *Ritchie* and *Escareno* are factually distinguishable and

inapplicable to this case.

¶ 56        In *Ritchie*, the Supreme Court addressed the question of "whether and to what

extent a State's interest in the confidentiality of its investigative files concerning child abuse

must yield to a criminal defendant's *** Fourteenth Amendment right to discover favorable

evidence." *Ritchie*, 480 U.S. at 42-43. There, the defendant was charged with several sexual

offenses against his minor daughter. *Id.* at 43. During pretrial discovery, he served the state

agency responsible for investigating allegations of child abuse with a subpoena, "seeking access

to the records concerning the daughter." *Id.* The agency refused to comply, arguing the records

were statutorily privileged—the relevant statute provided all information obtained during the

investigation must remain confidential, subject to several enumerated exceptions, including when

a court order directs the agency to disclose confidential information. *Id.* The trial court agreed

with the agency and declined to order disclosure. *Id.* at 44. A jury subsequently found the

defendant guilty on all counts. *Id.* at 45.

¶ 57        On appeal, the Supreme Court held the defendant had a limited due process right

to the requested records, the statutory privilege notwithstanding. *Id.* at 56-60. The Court

provided two bases for its holding. First, it pointed to the well-settled legal principle that "the

government has the obligation to turn over evidence in its possession that is both favorable to the

accused and material to guilt or punishment." *Id.* at 57. Second, it noted the statute at issue did

not grant the agency "absolute authority to shield its files from all eyes." *Id.* The Court added

that although the defendant had a right to the privileged material, the right "does not include the

unsupervised authority to search through the [State's] files." *Id.* at 59. Instead, the Court found

the defendant's interest in a fair trial "can be protected fully by requiring that the *** files be

submitted only to the trial court for *in camera* review." *Id.* at 60. However, to be entitled to an

*in camera* review of privileged information, a criminal defendant must "first establish[ ] a basis

for his claim that it contains material evidence." *Id.* at 58 n.15; see also *United States v.

Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (stating a criminal defendant cannot establish he

was unconstitutionally denied access to evidence without at least making "some plausible

showing" of how the evidence "would have been both material and favorable to his defense").

According to the Supreme Court, "evidence is material only if there is a reasonable probability

that, had the evidence been disclosed to the defense, the result of the proceeding would have

been different. A 'reasonable probability' is a probability sufficient to undermine confidence in

the outcome." (Internal quotation marks omitted.) *Ritchie*, 480 U.S. at 57.

¶ 58        In reviewing whether the trial court erred in determining an *in camera* review of

the unfounded report by DCFS was unnecessary and quashing the subpoena *duces tecum*, we

examine the court's decision for an abuse of discretion. See, *e.g.*, *People v. Hanson*, 238 Ill. 2d

74, 121, 939 N.E.2d 238, 265 (2010) (noting a subpoena is a judicial process and trial court decisions regarding subpoenas are reviewed for an abuse of discretion).

¶ 59　　　　In *Escareno*, the defendant issued a subpoena to DCFS requesting "confidential DCFS records relating to the victim's accusations against" him. *Escareno*, 2013 IL App (3d) 110152, ¶ 18. DCFS asserted the requested information was contained in an unfounded report and therefore privileged under section 7.14 of the Reporting Act. *Id.* The trial court quashed the subpoena without reviewing the records *in camera. Id.* ¶ 4. On appeal, the defendant argued the trial court deprived him of his constitutional right to present a defense by quashing the subpoena without first conducting an *in camera* review of the records. *Id.* ¶¶ 1, 16. Relying on *Ritchie*, the Third District agreed. *Id.* ¶ 20. In doing so, the *Escareno* court explicitly acknowledged that the Reporting Act is "different than the statute in *Ritchie.*" *Id.* Nonetheless, the Third District could not "ignore the due process concerns raised by failing to determine whether material information is contained within statutorily privileged records." Thus, the *Escareno* court held that "even though unfounded DCFS reports are made privileged by section 7.14 of the [Reporting] Act [citation], defendant has a constitutional right to all material information contained within the report." *Id.* (citing *People v. Bean*, 137 Ill. 2d 65, 97, 560 N.E.2d 258, 272 (1990)).

¶ 60　　　　Here, defendant has failed to establish a basis for his claim that the unfounded report by DCFS contained material evidence. At the hearing on the motion to quash, defendant argued the information in the report "could be relevant in several ways ***." Specifically, defendant asserted the report could show "interest and bias *** of the mother of the children *** who made these allegations." Defendant additionally maintained that "if there's contradictory statements, that would certainly be *Brady* material as well." However, defendant failed to describe how the report might establish interest or bias on Mercedes's part or explain how the

presence of "contradictory statements" by Mercedes could constitute material evidence. Even if defendant had provided further explanation as to how the unfounded report could bolster his claim of Mercedes's interest or bias, given the nature of the evidence in this case—primarily L.G.P.'s trial testimony and CAC statement directly implicating defendant of the crime—it appears unlikely that disclosure of the report would have resulted in a reasonable probability the jury would have found defendant not guilty. Thus, we do not find defendant made the requisite showing that the unfounded report was material evidence, which is necessary in order to implicate a defendant's constitutional right to discover privileged information. See *Valenzuela-Bernal*, 458 U.S. at 867 (stating a criminal defendant cannot establish he was unconstitutionally denied access to evidence without at least making "some plausible showing" of how the evidence "would have been both material and favorable to his defense"). Accordingly, because defendant failed to establish a basis for his claim he was entitled to an *in camera* review of the DCFS records, we conclude the trial court's decision to quash the subpoena was not an abuse of discretion. See *Ritchie*, 480 U.S. at 58 n.15.

¶ 61                                    C. *Voir Dire* Examination

¶ 62          Defendant also argues the trial court's *voir dire* examination violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), because the court grouped the four principles into one broad statement of law, thereby failing to implement the "precise question-and-response framework required by [Rule 431(b)]." Defendant acknowledges he forfeited this argument but contends we may review it under the first prong of the plain-error doctrine. See *People v. Thompson*, 238 Ill. 2d 598, 615, 939 N.E.2d 403, 414 (2010) (concluding a Rule 431(b) claim is reviewable under the first prong of the plain-error doctrine). Defendant further acknowledges in his reply brief that the supreme court recently rejected the same argument he now raises. See

*People v. Birge*, 2021 IL 125644, ¶ 34 ("[T]here is no requirement that the trial court recite the four principles separately."). However, defendant maintains he is nonetheless entitled to relief because of the "leading nature" of the court's questioning of jurors which he claims was error. He suggests this was somehow violative of Rule 431(b)'s requirement that the court "ask" prospective jurors whether they understand and accept the specified legal principles. Defendant provides no legal or logical support for his argument, and we find it is meritless. Therefore, defendant has failed to establish plain error occurred, and his claim is forfeited.

¶ 63                                     III. CONCLUSION

¶ 64          For the reasons stated, we affirm the trial court's judgment.

¶ 65          Affirmed.