2022 IL 127732

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 127732)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
SAMUEL SAULS, Appellant.

*Opinion filed November 28, 2022.*

JUSTICE ANNE M. BURKE delivered the judgment of the court, with opinion.

Justices Neville, Overstreet, Carter, and Holder White concurred in the judgment and opinion.

Justice Michael J. Burke dissented, with opinion, joined by Chief Justice Theis.

**OPINION**

¶ 1        Following a jury trial in the circuit court of Champaign County, defendant, Samuel Sauls, was convicted of one count of predatory criminal sexual assault of a child and sentenced to 20 years in prison. The appellate court affirmed his conviction and sentence. 2021 IL App (4th) 190667-U. On appeal to this court,

defendant raises two contentions: (1) that the trial court erred in quashing his pretrial subpoena *duces tecum* without first reviewing *in camera* the requested discovery documents and (2) that the State failed to prove his guilt beyond a reasonable doubt. We agree with defendant's first contention. We therefore reverse the appellate court's judgment and remand the cause to the circuit court for further proceedings consistent with this opinion.

¶ 2                                BACKGROUND

¶ 3         On August 13, 2018, defendant was charged by information with two counts of predatory criminal sexual assault of a child. Defendant was acquitted by the jury of one of the two counts, which we do not address in this appeal. The count for which defendant was convicted stated, "In that the said defendant, who was 17 years of age or older, committed an act of contact, however slight, between the sex organ of the defendant and the hand of [L.G.P.], who was under 13 years of age when the act was committed, and was for the purpose of sexual gratification or arousal of the defendant, in violation of [section 11-1.40(a)(1) of the Criminal Code of 2012 (720 ILCS 5/11-1.40(a)(1) (West 2018))]."

¶ 4         During the pretrial proceedings, defendant filed a supplemental motion for discovery and production of documents pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001). The motion requested that the State turn over documents pertaining to a Department of Children and Family Services (DCFS) investigation against Mercedes G.P., the mother of L.G.P., and Angel W., Mercedes's "live-in girlfriend." The defense specifically requested "DCFS investigations, police reports, and CAC [(Children's Advocacy Center)] interviews regarding allegations of abuse [against Mercedes and Angel] *** which were done in the Fall of 2018."

¶ 5         The State responded that it requested the documents from DCFS but was not successful in obtaining them. The State also asserted that it had searched local police databases for police reports that would satisfy defendant's request but that it appeared no such reports existed.

¶ 6         On March 14, 2019, the parties participated in a hearing on defendant's supplemental discovery motion. During the hearing, defense counsel explained that

- 2 -

it had come to her attention that Mercedes and Angel were subject to a DCFS investigation, including a CAC interview, that was determined to be unfounded. No documents from this investigation were turned over to the defense. The State informed the trial court that it had obtained a DCFS case number pertaining to the abuse allegations described in the defense motion but that it was unable to obtain any reports. Accordingly, defense counsel offered to prepare a subpoena *duces tecum* for the documents.

¶ 7        The trial judge entered an order directing the circuit court clerk to issue a subpoena *duces tecum*, drafted by defense counsel, to DCFS. On April 11, 2019, the clerk issued a subpoena *duces tecum* to DCFS, directing it to bring before the court "[a]ll records of investigations including but not limited to written reports, video or audio recording created since September 1, 2018, related to [Mercedes or Angel] in your possession or control."

¶ 8        On May 10, 2019, DCFS, through the Attorney General of Illinois, filed a motion to quash the subpoena. DCFS contended that the records sought by the subpoena pertained to an unfounded report, which was "confidential and inadmissible under Illinois law." In support, DCFS cited section 7.14 of the Abused and Neglected Child Reporting Act (Reporting Act), which provides:

> "[n]otwithstanding any other provision of law to the contrary, an unfounded report shall not be admissible in any judicial or administrative proceeding or action except for proceedings under Sections 2-10 and 2-21 of the Juvenile Court Act of 1987 involving a petition *** alleging abuse or neglect to the same child, a sibling of the child, or the same perpetrator." 325 ILCS 5/7.14 (West 2018).

Alternatively, DCFS offered to turn over the report to the trial court for an *in camera* review. If, after reviewing the report, the court determined that limited disclosure was warranted, DCFS requested that the court enter a protective order prohibiting disclosure of the names or identifying information in the report.

¶ 9        At a hearing on the motion to quash subpoena, the State objected to an *in camera* review of the requested documents because the DCFS report was unfounded and not admissible at trial. Defense counsel argued that the information in the reports was relevant because it pertained to the interests and biases of the

victim's mother and her live-in girlfriend and might reveal contradictory statements by the witnesses. The trial court indicated it understood defendant was requesting "to look at unfounded reports for potential impeachment of a witness that testifies at trial." Nevertheless, after hearing argument from both parties, the trial court granted DCFS's motion and quashed the subpoena, without requiring production or *in camera* review of the requested documents.

¶ 10 The case proceeded to a jury trial on July 29, 2019. L.G.P. testified that in August 2017, when she was seven years old, she and her sister, J.G.P., stayed overnight at defendant's house with defendant's daughter, N.S. N.S. was L.G.P. and J.G.P.'s cousin. L.G.P. testified that she thought her grandmother dropped her off at the sleepover.

¶ 11 L.G.P. testified that she fell asleep while watching a movie in defendant's bedroom with J.G.P., N.S., and defendant. She testified that she and her sister were on the floor and N.S. and defendant were on defendant's bed. At some point during the night, L.G.P. woke up in defendant's bed. She did not know how she got there. L.G.P. testified that, when she woke up in defendant's bed, she initially thought she was holding her fingers. She then realized she was holding defendant's "private" in her hand. She testified that defendant "was just laying down right there and just on his phone I think." She could not remember what defendant was wearing but thought he had on a T-shirt. L.G.P. testified that her hands had "sticky stuff" on them, so she went to the bathroom to wash them and then went back to sleep. She said that the lighting was "darkish, lightish" and could not remember if the television in the bedroom was on.

¶ 12 L.G.P. testified that she did not tell her mother about the incident right away because she was scared. Eventually, she said, she did tell her mother about the incident when she saw N.S. and defendant together " '[c]ause I thought he would try to get [N.S.] *** it upset me 'cause I didn't want [N.S.] to go over there cause [unintelligible] same thing happen to her."

¶ 13 On cross-examination, L.G.P. stated she could not remember the color of the sheets or the number of pillows on the bed. When asked whether she remembered telling someone that defendant's hands were under his head and not holding his phone, she responded: "I can't really remember that good, if he had a phone or not.

I could just remember, like, the bedroom stuff and like, what happened. But I don't really know the details of stuff."

¶ 14    Francisco G., L.G.P.'s father, testified that in August 2017 he attended a family birthday party for defendant's daughter and L.G.P.'s cousin, N.S., who was turning three years old. Francisco testified that, after the party, defendant invited L.G.P. and her younger sister, J.G.P., to his house for a sleepover with N.S. Francisco testified that, on the day after the sleepover, L.G.P. said "she didn't want to go back [to defendant's house]." When Francisco asked why, "she just looked down *** but she didn't say—she wouldn't say why."

¶ 15    Mercedes, L.G.P.'s mother, testified that she and Francisco dropped L.G.P. and J.G.P. off at defendant's house on the day after N.S.'s third birthday, and they picked them up the following day. Mercedes testified that the girls were quiet in the car. According to Mercedes, L.G.P. told her "a couple days later" that she did not "ever want to spend the night with [defendant] again." Mercedes asked why, and L.G.P. explained that she woke up with defendant's finger in her hand and then asked to use the bathroom to wash her hands. L.G.P. also said that defendant was not wearing a shirt or boxers. Mercedes then asked if anything felt "not normal" to her or if she had been touched, but L.G.P. said no.

¶ 16    Mercedes testified that in May 2018, she had a family gathering at her house, which N.S. attended. L.G.P. later saw N.S. getting into defendant's car and told Mercedes: "Mama, please. Don't let her go with him 'cause he's going to do what he did to me. It wasn't his finger, *** it was his private part." After this disclosure, Mercedes scheduled a doctor's appointment for L.G.P.

¶ 17    Dr. Mary Kathleen Buetow, a licensed pediatrician specializing in child abuse and neglect, testified that she met with L.G.P. and Mercedes. Dr. Buetow and a clinical social worker interviewed L.G.P. in an exam room outside the presence of her mother. During the interview, L.G.P. explained that she had stayed the night with defendant because she wanted to have a sleepover with N.S. L.G.P. told Dr. Buetow she slept in the same room as N.S., J.G.P., and defendant; L.G.P. and defendant slept in the bed, while J.G.P. and N.S. slept on a "pallet" on the floor. L.G.P. continued: "[W]hen I woke up I thought I was holding [defendant's] finger, but it wasn't his finger. It was his private part. It was his penis, and my hand was wet so I got up and went to the bathroom and washed my hand." According to Dr.

Buetow, L.G.P. told her that she did not ever want to be around defendant, that she was having nightmares and would see his face in the middle of the night, and that she was very fearful of him and not sleeping well. Dr. Buetow gave L.G.P. an examination, in Mercedes's presence, which did not indicate any physical injury or infection. Dr. Buetow testified that she reported L.G.P.'s allegations to DCFS.

¶ 18 Chad Turner, a child protective investigator for DCFS, testified that he conducted a forensic interview with L.G.P. at the CAC. The interview was recorded. The recording was admitted into evidence and played for the jury. In her CAC interview, L.G.P. stated that she spent the night at defendant's house after N.S.'s birthday party. L.G.P. said there was a bed and a pallet in defendant's room and that she slept on the bed. She later clarified that she fell asleep on the pallet but woke up in the bed. In describing the incident, L.G.P. stated, "I was lying down, and I thought I was holding his finger, and I woke up and it was his private. So, I said can I go to the bathroom. I went to the bathroom and washed my hands. I came back and laid down." L.G.P. explained that she washed her hands because they were "like wet kind of." L.G.P. said defendant "had a t-shirt on but his underwear was pulled down." She also stated that defendant was "laying on his hands" and made a gesture of two hands, palms together, under the side of her head. Turner asked L.G.P. to indicate on an anatomical diagram which part of defendant's body was in her hand. L.G.P. pointed to the penis on the diagram. When asked to describe what was on her hands, she said that it was like "sticky kind of water."

¶ 19 On cross-examination, Turner acknowledged that defendant's wife, Desiree P.S., had told him about a "physical altercation" between defendant and Mercedes that occurred shortly before L.G.P. "started to appear to be afraid of [defendant]." Turner testified that this did not give him cause to believe that L.G.P. had been coached. Following Turner's testimony, the State rested.

¶ 20 Rose P., L.G.P.'s grandmother, testified that N.S. and Desiree had lived with her since early 2017. Rose said she attended N.S.'s birthday party in 2017 and dropped off clothes for her at defendant's house the next day. According to Rose, N.S. was the only child present. Rose stated that defendant had a positive relationship with L.G.P. and J.G.P. She testified that the girls were "always glad" to see defendant and that he would "pick them up and hug them and put them down."

¶ 21 Rose testified that over the Memorial Day weekend in 2018, Mercedes and her friend, Angel, were at Rose's house with L.G.P. and other family members. Rose left briefly, and when she returned, "everyone was hollering." Rose testified that L.G.P. was standing on the porch and that Angel and Mercedes were repeatedly telling L.G.P. to "[t]ell them, *** tell them what's next." Rose testified that she did not see L.G.P. and J.G.P. as frequently after this event.

¶ 22 Desiree testified that she had been separated from defendant since 2015. Desiree attended N.S.'s birthday party in 2017 and said N.S. stayed with defendant for a few days after the party. Desiree testified that, earlier in 2017, she had been fighting with defendant over taxes and, at that time, everyone knew that Desiree was not talking to defendant or letting him see N.S. On one occasion, Desiree testified, defendant came to the house when Mercedes, L.G.P., and J.G.P. were present. This led to Mercedes trying to keep defendant from coming into the house to get N.S. against Desiree's wishes and to defendant pushing Mercedes in front of L.G.P. and J.G.P., who were shocked. Desiree testified that she and defendant eventually resolved the tax issue and defendant came around more often. She testified that L.G.P. and J.G.P. always smiled around him and that she never observed fear or reticence toward defendant. On cross-examination, Desiree testified that she was not at defendant's house after N.S.'s birthday party and did not know whether L.G.P. and J.G.P. stayed overnight at defendant's house.

¶ 23 Defendant testified in his own defense. He testified that N.S. stayed with him after her birthday party but that L.G.P. and J.G.P. did not stay that night. Defendant testified that when his nieces had stayed overnight on previous occasions, they would sleep in his bedroom, and he would sleep on the couch in the living room. He testified he had never set up a pallet for them, and they had never slept on the floor at his house. Defendant also testified that he had not shared a bed with his nieces since they were "in diapers." Defendant denied ever putting his penis in L.G.P.'s hand.

¶ 24 Following the presentation of evidence and closing arguments, the jury found defendant guilty of one count of predatory criminal sexual assault of a child. The trial court later sentenced defendant to 20 years in prison.

¶ 25 The appellate court affirmed defendant's conviction. 2021 IL App (4th) 190667-U. The court first held that the evidence was sufficient to sustain

defendant's conviction beyond a reasonable doubt. *Id.* ¶ 53. The court next rejected defendant's argument that the trial court deprived him of his constitutional right to material evidence by quashing his subpoena *duces tecum* without first reviewing the documents *in camera*. *Id.* ¶¶ 55, 60. Citing *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), the court held that defendant "failed to establish a basis for his claim that the unfounded report by DCFS contained material evidence." 2021 IL App (4th) 190667-U, ¶ 60.

¶ 26        The court reasoned as follows:

"At the hearing on the motion to quash, defendant argued the information in the report 'could be relevant in several ways ***.' Specifically, defendant asserted the report could show 'interest and bias *** of the mother of the children *** who made these allegations.' Defendant additionally maintained that 'if there's contradictory statements, that would certainly be *Brady* material as well.' However, defendant failed to describe how the report might establish interest or bias on Mercedes's part or explain how the presence of 'contradictory statements' by Mercedes could constitute material evidence. Even if defendant had provided further explanation as to how the unfounded report could bolster his claim of Mercedes's interest or bias, given the nature of the evidence in this case—primarily L.G.P.'s trial testimony and CAC statement directly implicating defendant of the crime—it appears unlikely that disclosure of the report would have resulted in a reasonable probability the jury would have found defendant not guilty. Thus, we do not find defendant made the requisite showing that the unfounded report was material evidence, which is necessary in order to implicate a defendant's constitutional right to discover privileged information. [Citation.] Accordingly, because defendant failed to establish a basis for his claim he was entitled to an *in camera* review of the DCFS records, we conclude the trial court's decision to quash the subpoena was not an abuse of discretion. See *Ritchie*, 480 U.S. at 58 n.15." *Id.*

¶ 27        Finally, the appellate court rejected defendant's argument that the trial court's *voir dire* examination violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). 2021 IL App (4th) 190667-U, ¶ 62.

¶ 28    This court allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2021).

¶ 29                                    ANALYSIS

¶ 30                            I. Subpoena *Duces Tecum*

¶ 31    Defendant argues that the trial court erred in quashing his subpoena *duces tecum* without first requiring production of the relevant documents, reviewing the documents *in camera* to determine whether any material information was contained therein, and disclosing that material information to the defense. According to defendant, this violated his constitutional right to any *Brady* evidence that may have been in the report. Defendant requests that we remand to the trial court with directions to perform an *in camera* review of the subpoenaed documents and, if the trial court determines that the records contain information that probably would have changed the outcome of the trial, grant defendant a new trial.

¶ 32    A trial court's discovery rulings generally are subject to review under an abuse of discretion standard. *People v. Williams*, 209 Ill. 2d 227, 234 (2004). We review *de novo*, however, whether defendant was denied due process and, if so, whether that denial was prejudicial. *People v. Arze*, 2016 IL App (1st) 131959, ¶ 104 (citing *People v. K.S.*, 387 Ill. App. 3d 570, 573 (2008)).

¶ 33    A subpoena *duces tecum* is a judicial process that compels a person to appear in court and present specified documents, records, or things. *People v. Shukovsky*, 128 Ill. 2d 210, 222 (1988); Black's Law Dictionary (11th ed. 2019). Subpoenaed documents are sent directly to the court, which then determines the relevancy of the documents and whether they are privileged, as well as whether the subpoena is unreasonable or oppressive. *People ex rel. Fisher v. Carey*, 77 Ill. 2d 259, 265 (1979). A criminal defendant's right to compel production of documents through a subpoena is protected by the sixth amendment to the United States Constitution (U.S. Const., amend. VI), as applied to the states through the due process clause of the fourteenth amendment (U.S. Const., amend. XIV), and applies to discovery in all criminal prosecutions. *People ex rel. Fisher*, 77 Ill. 2d at 265. To justify the issuance of a subpoena *duces tecum*, the moving party must show:

" '(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition." ' " *Id.* at 269 (quoting *United States v. Nixon*, 418 U.S. 683, 699-700 (1974)).

¶ 34    DCFS did not object to the subpoena *duces tecum* on the grounds that the requested documents were not evidentiary or relevant, that the documents were otherwise procurable reasonably in advance of trial by the exercise of due diligence, that the defense could properly prepare for trial without production and inspection of the documents, that the application was not made in good faith or was intended as a general "fishing expedition," or that compliance with the subpoena would be unreasonable or oppressive. Rather, the sole basis for the motion to quash was that the documents were confidential and inadmissible under section 7.14 of the Reporting Act. See 325 ILCS 5/7.14 (West 2018) ("[n]otwithstanding any other provision of law to the contrary, an unfounded report shall not be admissible in any judicial or administrative proceeding or action except for proceedings under Sections 2-10 and 2-21 of the Juvenile Court Act of 1987"). As such, this case falls squarely within the framework set forth in *Ritchie*, 480 U.S. 39.

¶ 35    In *Ritchie*, the defendant, George Ritchie, was charged with rape, involuntary deviate sexual intercourse, incest, and corruption of a minor, his then-13-year-old daughter. *Id.* at 43. During pretrial discovery, Ritchie served the investigative agency, Children and Youth Services (CYS), with a subpoena, seeking access to records pertaining to the current charges. *Id.* He also sought records contained in a separate report of child abuse involving his children. CYS refused to comply with the subpoena. It argued that the records were privileged under a Pennsylvania statute providing that all information obtained in a CYS investigation must be kept confidential, subject to 11 specific exceptions. *Id.* One of those exceptions was that CYS may disclose the reports to a " 'court of competent jurisdiction pursuant to a court order.' " *Id.* at 43-44 (citing 11 Pa. Stat. Ann., § 2215(a)(5) (Purdon Supp. 1986)).

¶ 36    Ritchie moved to sanction CYS for failing to honor the subpoena. During a hearing on the motion, Ritchie argued "that he was entitled to the information because the file might contain the names of favorable witnesses, as well as other, unspecified exculpatory evidence." *Id.* at 44. The trial court denied the motion, but the appellate court reversed and remanded for further proceedings. *Id.* at 45. The Supreme Court of Pennsylvania affirmed, holding that Ritchie, through his counsel, was entitled to review the entire CYS file to search for evidence useful to his defense. *Id.* at 46.

¶ 37    On appeal to the United States Supreme Court, the Court first restated the well-settled principle that "the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Id.* at 57 (citing *Brady*, 373 U.S. at 87). "Materiality," the Court held, is defined as " 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,' " and a "reasonable probability" is " 'a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The Court recognized the impossibility of determining materiality, however, when neither the parties nor the court have access to the confidential documents:

> "At this stage, of course, it is impossible to say whether any information in the CYS records may be relevant to Ritchie's claim of innocence, because neither the prosecution nor defense counsel has seen the information, and the trial judge acknowledged that he had not reviewed the full file. The Commonwealth, however, argues that no materiality inquiry is required, because a statute renders the contents of the file privileged. Requiring disclosure here, it is argued, would override the Commonwealth's compelling interest in confidentiality on the mere speculation that the file 'might' have been useful to the defense." *Id.*

¶ 38    The Court rejected the Commonwealth's argument. It held that the Pennsylvania statute did not provide an absolute privilege against disclosure of CYS documents but, rather, allowed disclosure under certain circumstances. *Id.* at 57-58. For this reason, the Court concluded that the statute did not prevent all disclosure in criminal proceedings, as the Commonwealth contended. *Id.* at 58. Rather, "[i]n the absence of any apparent state policy to the contrary, we therefore

have no reason to believe that relevant information would not be disclosed when a court of competent jurisdiction determines that the information is 'material' to the defense of the accused." *Id.*

¶ 39       The Court held that the privacy interests inherent in the CYS files could be balanced with Ritchie's right to *Brady* evidence through the same *in camera* review procedure requested by defendant in this case:

> "We therefore affirm the decision of the Pennsylvania Supreme Court to the extent it orders a remand for further proceedings. Ritchie is entitled to have the CYS file reviewed by the trial court to determine whether it contains information that probably would have changed the outcome of his trial. If it does, he must be given a new trial. If the records maintained by CYS contain no such information, or if the nondisclosure was harmless beyond a reasonable doubt, the lower court will be free to reinstate the prior conviction." *Id.*

In so holding, the Court disagreed with the Pennsylvania Supreme Court that the defense was entitled to unfettered access to the files to search for useful evidence. *Id.* at 59-61. The Court held that Ritchie's interest in ensuring a fair trial could be fully protected by submitting the files to the trial court for an *in camera* review. *Id.* at 60. Moreover, the trial court's duty to disclose material evidence in the files was ongoing; if information became material as the trial progressed, the trial court had an ongoing duty to disclose it to the defense. *Id.*

¶ 40       Both this court and our appellate court have adopted *Ritchie*'s framework for balancing a defendant's constitutional right to *Brady* evidence against the interests in protecting confidential records. In *People v. Bean*, 137 Ill. 2d 65, 99 (1990), a death penalty case, the trial court employed the same *in camera* review process set forth in *Ritchie*. On direct appeal to this court, defendant argued that his sixth amendment rights were violated because the trial court did not give his counsel full access to all the mental health records of an important state witness. *Id.* at 89. The records at issue were protected by the Mental Health and Developmental Disabilities Confidentiality Act (Ill. Rev. Stat. 1979, ch. 91½, ¶ 801 *et seq.*), which provided that such records were privileged, confidential, and not subject to disclosure in any judicial proceeding, except for certain stated exceptions. *Bean*, 137 Ill. 2d at 92, 99-100.

¶ 41 Relying on *Ritchie*, this court held that the defendant's constitutional rights outweighed the confidentiality of the documents, but only to the extent that a trial court determined the privileged information to be relevant and impeaching. *Id.* at 99-100. We thus held that the trial judge did not err in reviewing the records *in camera*, holding a hearing at which both parties were allowed to argue their respective positions, then disclosing all information he thought was relevant and could be used to impeach the witness. *Id.*; *cf. People v. Foggy*, 121 Ill. 2d 337, 347 (1988) (holding the defendant was not entitled to an *in camera* review of subpoenaed documents because the documents were statutorily protected by absolute, unqualified privilege).

¶ 42 In a case involving similar circumstances to the instant case, *People v. Escareno*, 2013 IL App (3d) 110152, ¶ 3. the defendant sought to obtain records from a DCFS investigation pertaining to the current charges, as well as records in a separate DCFS investigation involving allegations by the victim against another individual. DCFS refused to comply with the subpoena on the ground that the information was contained in an unfounded report and, thus, confidential under section 7.14 of the Reporting Act. *Id.* The defendant argued that he was denied his constitutional right to present a defense when the trial court quashed his subpoena to DCFS without first conducting an *in camera* review of the subpoenaed records. *Id.* ¶¶ 3, 16. Citing *Ritchie* and *Bean*, the appellate court concluded that "a defendant has a limited right to examine otherwise statutorily privileged information if the evidence is relevant and material, and if its relevance is not outweighed by other factors." *Id.* ¶ 16. Accordingly, the court remanded to the trial court with directions to conduct an *in camera* review of the DCFS documents and determine whether the documents contained information that, if disclosed to the defense, probably would have changed the outcome of the trial. *Id.* ¶ 21. The court held that, if so, defendant should be granted a new trial; if not, his conviction should not be disturbed. *Id.*

¶ 43 The State concedes that *Ritchie* is instructive and that section 7.14 of the Reporting Act falls within *Ritchie*'s holding. The State argues, however, that *Ritchie* requires a party to make "an initial showing of materiality" prior to obtaining an *in camera* review of confidential documents. In other words, the State would require that a party seeking disclosure of confidential documents must make a preliminary showing that the evidence contained in the documents probably

would have changed the result of his trial. See *Ritchie*, 480 U.S. at 57 (defining "material" as " 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different' " (quoting *Bagley*, 473 U.S. at 682)). The State further argues that defendant failed to make the requisite initial showing of materiality in this case.

¶ 44    The appellate court below agreed with the State that defendant was not entitled to an *in camera* review because he failed to establish the requested documents were material. Even though neither the parties nor the court knew what the documents contained, the appellate court held that, "given the nature of the evidence in this case—primarily L.G.P.'s trial testimony and CAC statement directly implicating defendant of the crime—it appears unlikely that disclosure of the report would have resulted in a reasonable probability the jury would have found defendant not guilty." 2021 IL App (4th) 190667-U, ¶ 60. We disagree with the State's reading of *Ritchie*, as adopted by the appellate court.

¶ 45    The State bases its argument on a single sentence in a footnote in *Ritchie*. The footnote relied on by the State, footnote 15, is inserted after the Court's conclusion that "Ritchie is entitled to have the CYS file reviewed by the trial court to determine whether it contains information that probably would have changed the outcome of his trial." *Ritchie*, 480 U.S. at 58. Footnote 15 states:

"The Commonwealth also argues that Ritchie is not entitled to disclosure because he did not make a particularized showing of what information he was seeking or how it would be material. See Brief for Petitioner 18 (quoting *United States v. Agurs*, 427 U. S. 97, 109-110 (1976) ('The mere possibility that an item of undisclosed information might have helped the defense . . . does not establish 'materiality' in the constitutional sense')). Ritchie, of course, may not require the trial court to search through the CYS file without first establishing a basis for his claim that it contains material evidence. See *United States v. Valenzuela-Bernal*, 458 U. S. 858, 867 (1982) ('He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense'). Although the obligation to disclose exculpatory material does not depend on the presence of a specific request, we note that the degree of specificity of Ritchie's request may have a bearing on the trial court's assessment on remand of the materiality of the nondisclosure. See *United States*

*v. Bagley*, 473 U. S. 667, 682-683 (1985) (opinion of BLACKMUN, J.)." *Id.* at 58 n.15.

¶ 46 The sentence in footnote 15 that the State relies on is the following: "Ritchie, of course, may not require the trial court to search through the CYS file without first establishing a basis for his claim that it contains material evidence." *Id.* The State argues that this single sentence in footnote 15 established a new rule, requiring a party to make a showing of materiality *before* the trial court reviews the documents *in camera* and before defense counsel has seen the documents. We disagree. Language in an opinion must not be " ' "ripped from its context to make a rule far broader than the factual circumstances which called forth the language." ' " *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, ¶ 30 (quoting *Rosewood Care Center, Inc. v. Caterpillar, Inc.*, 226 Ill. 2d 559, 572 (2007)). Rather, *Ritchie*, like all other opinions, " 'must be read as applicable only to the facts involved and is an authority only for what is actually decided.' " *Id.* (quoting *Spring Hill Cemetery of Danville v. Ryan*, 20 Ill. 2d 608, 619 (1960)). Here, the State isolates a single sentence in footnote 15 and reads it out of context with the surrounding opinion and its holding. If the Court had, in fact, required Ritchie to make a showing of materiality prior to an *in camera* review of confidential documents, he would not have prevailed. Consequently, the sentence in footnote 15 upon which the State relies cannot mean what the State says it means.

¶ 47 The Supreme Court's statement that the defendant in *Ritchie* "of course" had to establish a "basis" for his claim that the confidential file contained material evidence was simply a summation of existing law, *i.e.*, that a party seeking a subpoena must show, *inter alia*, that the documents are evidentiary and relevant and that the application was made in good faith and not intended as a "fishing expedition." See *Nixon*, 418 U.S. at 699-700. The Supreme Court did not require anything more. Indeed, it is clear that the showing for obtaining *in camera* review of confidential documents need not be more specific than the one presented by the defendant in *Ritchie*. The only showing the defendant made in that case was that "the file might contain the names of favorable witnesses, as well as other, unspecified exculpatory evidence." *Ritchie*, 480 U.S. at 44. This showing was sufficient, the Court held, to "entitle" Ritchie to an *in camera* review of the documents by the trial court to determine the materiality of the evidence. *Id.* at 58,

61. Thus, the Court did not apply the rule that the State contends should be applied in this case.

¶ 48    This case is on all fours with the facts in *Ritchie*, *Bean*, and *Escareno*, and the same holding applies. The documents requested in defendant's subpoena *duces tecum* pertained to an unfounded DCFS report. An unfounded report is confidential and generally protected from disclosure, with certain exceptions listed in section 7.14, and is inadmissible in judicial proceedings other than proceedings under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2018)). See 325 ILCS 5/7.14, 11 (West 2018). Defense counsel subpoenaed the documents in question and represented to the trial court a good-faith belief that the documents were relevant to showing interests or biases of the witnesses and might provide impeachment evidence in the form of prior inconsistent statements. This showing is at least as specific as the showing that the Supreme Court held was sufficient in *Ritchie*. Because the documents in this case may have led to the discovery of other admissible evidence, regardless of whether they were admissible on their own terms, section 7.14 of the Reporting Act did not obviate the State's obligation to turn over the requested documents. See *People v. Kladis*, 2011 IL 110920, ¶ 26 ("pretrial discovery 'presupposes a range of relevance and materiality which includes not only what is admissible at the trial, but also that which leads to what is admissible.' " (quoting *Krupp v. Chicago Transit Authority*, 8 Ill. 2d 37, 41 (1956))).

¶ 49    As in *Ritchie* and *Escareno*, the proper remedy is remand for the trial court to perform an *in camera* review of the documents described in the subpoena to determine whether they contain information that probably would have changed the outcome of defendant's trial. *Ritchie*, 480 U.S. at 57-60; *Escareno*, 2013 IL App (3d) 110152, ¶¶ 18-21. If the trial court determines that the documents contain information that probably would have changed the outcome of the trial if disclosed to the defense, defendant "must be given a new trial." *Ritchie*, 480 U.S. at 58; see also *Escareno*, 2013 IL App (3d) 110152, ¶ 21. If the documents contain no such information, or if the nondisclosure was harmless beyond a reasonable doubt, the trial court will be free to reinstate the prior conviction. *Ritchie*, 480 U.S. at 58.

¶ 50    In the event that the trial court determines defendant is not entitled to a new trial, we will address defendant's contention that the evidence at his trial was

insufficient to convict him of the charged crime beyond a reasonable doubt.

¶ 51                               II. Sufficiency of the Evidence

¶ 52        When considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the required elements of the crime beyond a reasonable doubt. *People v. Belknap*, 2014 IL 117094, ¶ 67. It is not the function of this court to retry the defendant. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *People v. Campbell*, 146 Ill. 2d 363, 375 (1992). Accordingly, a reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses. *Id.* The positive, credible testimony of a single witness, even if contradicted by the defendant, is sufficient to convict a defendant. *People v. Gray*, 2017 IL 120958, ¶ 36. On appeal from a criminal conviction, we will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Id.* ¶ 35.

¶ 53        To prove defendant guilty of predatory criminal sexual assault, the State was obligated to prove that defendant was 17 years of age or older and committed "an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused" and that the victim was under 13 years of age. 720 ILCS 5/11-1.40(a)(1) (West 2018). There is no dispute that defendant was over 17 years old and that the victim was under 13 years old, at the time of the incident in this case.

¶ 54        L.G.P. testified at trial that she attended a sleepover at defendant's house and that she awoke during the night to find defendant's penis in her hand and that her hand was wet and sticky. If believed by the jury, L.G.P.'s testimony alone was sufficient to prove that defendant committed "an act of contact *** between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification." *Id.* § 11-1.40(a). Moreover, additional evidence corroborated L.G.P.'s account, reinforcing her credibility. The evidence showed that L.G.P.

promptly reported the contact and that her allegations remained consistent throughout the time leading up to trial. L.G.P.'s mother, Mercedes, testified that L.G.P. told her she never wanted to go to defendant's house again and that she woke up during the sleepover with defendant's "finger" in her hand. Mercedes also testified that on May 30, 2018, L.G.P. told her that defendant had put his penis, not his finger, in her hand.

¶ 55        Dr. Buetow and Chad Turner, the DCFS investigator, both testified about their one-on-one interviews with L.G.P., during which she told them that she awoke during the sleepover with defendant's penis in her hand. Finally, the jury watched L.G.P.'s interview with Turner, in which she recounted that night's events consistently with her trial testimony.

¶ 56        In support of his argument that he was not proved guilty beyond a reasonable doubt, defendant contends that L.G.P. either could not recall the details or changed her account of the incident at various times. Defendant points to the following inconsistencies in the testimony: L.G.P. could not describe the bedding, the pillows, or who picked her up after the sleepover; she could not remember the lighting conditions or whether the television was still on; on the stand, she testified that defendant's hands were on his phone during the offense, but during her CAC interview, she said that he was lying with his hands under his head; L.G.P. testified that defendant was wearing a T-shirt, but Mercedes testified that L.G.P. told her defendant was not wearing a shirt; and Dr. Buetow testified that L.G.P. told her that she slept in the bed and that N.S. and J.G.P. were sleeping on a pallet on the floor, but in the recorded interview, L.G.P. stated that she slept on the pallet.

¶ 57        However, the jury was aware of these minor inconsistencies in the testimony, and it nevertheless found L.G.P.'s account to be sufficiently credible to find defendant guilty. The jury reasonably could have considered that L.G.P. either forgot or was mistaken about some of the details because she was seven years old at the time of the incident and testified at trial nearly two years later. It was the function of the jury to assess the credibility of the witnesses and resolve discrepancies in the testimony, and we cannot substitute our judgment for that of the jury. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the required elements of the crime beyond a reasonable doubt. Thus, we find

the evidence presented at trial was sufficient to convict defendant of predatory criminal sexual assault of a child.

¶ 58                                CONCLUSION

¶ 59     For the foregoing reasons, the judgment of the appellate court is reversed. The cause is remanded to the circuit court with directions to conduct an *in camera* review of the aforementioned records.

¶ 60     Appellate court judgment reversed.

¶ 61     Cause remanded with directions.

¶ 62     JUSTICE MICHAEL J. BURKE, dissenting:

¶ 63     I agree with the majority's conclusion that the evidence of guilt presented against defendant was sufficient beyond a reasonable doubt to convict him of predatory criminal sexual assault of a child. I disagree, however, with the majority's conclusion that application of the framework set forth in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), requires that the cause be remanded for an *in camera* review of the unfounded DCFS report. The majority erroneously creates an automatic right to have a trial judge conduct *in camera* review of unfounded DCFC investigation documents whenever a defendant simply alleges that the documents are material, regardless of whether defendant can make "some plausible showing" that there is a basis for the claim that the documents contain material evidence. This contrasts with *Ritchie*, which noted as follows:

> "[Defendant], of course, may not require the trial court to search through the [Children and Youth Services (CYS)] file without first establishing a basis for his claim that it contains material evidence. See *United States v. Valenzuela-Bernal*, 458 U. S. 858, 867 (1982) ('He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense')." *Id.* at 58 n.15.

Because the majority does not recognize this "plausible showing" standard and because defendant has failed to satisfy it, I respectfully dissent.

¶ 64  *Ritchie* addressed a similar situation. There, the defendant served Pennsylvania's CYS agency with a subpoena for records concerning his daughter, who had accused him of rape. *Id.* at 43. CYS refused to comply with the subpoena, arguing that Pennsylvania law required that "all reports and other information obtained in the course of a CYS investigation must be kept confidential." *Id.* The defendant argued that he was entitled to the information because the file might contain the names of favorable witnesses, as well as other, unspecified exculpatory evidence. *Id.* at 44. The trial court denied the request. The United States Supreme Court explained on review that the government cannot withhold material evidence simply because it is statutorily privileged if the statutory privilege is not absolute. *Id.* at 57. In *Ritchie*, the privilege was not absolute, and the Court therefore rejected the State's argument that the statutory privilege would preclude an examination of the agency's records. *Id.* However, the Court denied defendant's further request that the records—though discoverable—be disclosed directly to him. *Id.* at 59-60. Noting that due process does not grant a defendant "the unsupervised authority to search through" the government's files (*id.* at 59), the Court instead held that the defendant's rights and Pennsylvania's "compelling interest in protecting its child abuse-information" were properly balanced by an *in camera* review of the records (*id.* at 60). But the Court also clarified that "[the defendant], of course, may not require the trial court to search through the CYS file without first establishing a basis for his claim that it contains material evidence." *Id.* at 58 n.15 (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) ("He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.")).

¶ 65  In other words, *Ritchie* established the following procedure: where a defendant believes that the government is in possession of material information and the government asserts that the information must be kept confidential pursuant to statute, the defendant must establish a basis for his belief that the information is material; if he does so, then the court conducts an *in camera* review and discloses any material evidence. Defendant's contrary argument, that under *Ritchie*, his request for the DCFS report automatically triggered the trial court's obligation to conduct an *in camera* review of the report—without regard for whether defendant

made any showing that the report contained material evidence—rests on a misreading of *Ritchie* and has been rejected by most federal and state courts to consider the issue. See, *e.g.*, *People v. Stanaway*, 521 N.W.2d 557, 574 (Mich. 1994); *Zapata v. People*, 2018 CO 82, ¶ 54; *State v. Gregory*, 147 P.3d 1201, 1219 (Wash. 2006) (*en banc*), *overruled on other grounds*, *State v. W.R.*, 336 P.3d 1134 (Wash. 2014) (*en banc*); *State v. Peseti*, 65 P.3d 119, 133 (Haw. 2003); *State v. Hummel*, 483 N.W.2d 68, 72 (Minn. 1992); *State v. Sanders*, 92 Ohio St. 3d 245, 2001-Ohio-189, 750 N.E.2d 90, ¶ 37; *Stripling v. State*, 401 S.E.2d 500, 505 (Ga. 1991); *State v. Gagne*, 612 A.2d 899, 901 (N.H. 1992); *United States v. Lee*, 660 F. App'x 8, 14 (2d Cir. 2016); *United States v. Williams*, No. 94-1247, 1996 WL 219606, at *4 (E.D.N.Y Apr. 30, 1996); *United States v. Abdallah*, 911 F.3d 201, 217 (4th Cir. 2018); *United States v. Trevino*, 89 F.3d 187, 189-90 (4th Cir. 1996); *Smith v. Cromer*, 159 F.3d 875, 882 (4th Cir. 1998); *United States v. Stampe*, 994 F.3d 767, 771 (6th Cir. 2021), *overruled on other grounds*, ___ U.S. ___,142 S. Ct. 1356 (2021)); *United States v. Jumah*, 599 F.3d 799, 809-10 (7th Cir. 2010); *Dietrich v. Smith*, 701 F.3d 1192, 1196 (7th Cir. 2012).

¶ 66    I find this precedent persuasive and would therefore reject defendant's argument that *Ritchie* established an unqualified right to *in camera* review whenever a defendant seeks information subject to a statutory requirement that it be kept confidential. The Minnesota Supreme Court's decision in *Hummel* is illustrative. There, the question was whether a trial court erred in refusing to conduct *in camera* review of confidential medical records when requested by a defendant despite "*no showing of relatedness to the case*." (Emphasis added.) *Hummel*, 483 N.W.2d at 71. The court found *Ritchie*'s holding to be "absolutely clear that some showing is required before in camera review is granted." *Id.* at 72 (citing *Ritchie*, 480 U.S. at 58 n.15). Similarly, the Colorado Supreme Court reasoned that "*Ritchie* does not hold that trial courts must always review privileged reports in camera" but instead "expressly noted that a defendant 'may not require the trial court to search through the [privileged] file without first establishing a basis for his claim that it contains material evidence.' " *Zapata*, 2018 CO 82, ¶ 54 (quoting *Ritchie*, 480 U.S. at 58 n.15). And the Hawaii Supreme Court explained that there are cogent reasons for disallowing general pretrial discovery of privileged information but allowing access to such information upon a proper showing by the defendant that the information may change the outcome of the trial. *Peseti*, 65 P.3d at 133.

¶ 67 Indeed, this court has already recognized that a preliminary showing of materiality is relevant in determining whether a defendant may receive an *in camera* review of otherwise privileged documents. In *People v. Foggy*, 121 Ill. 2d 337, 340 (1988), the defendant subpoenaed a rape victim's confidential counseling records. Citing an Illinois statute that established an absolute bar to the release of counseling records, the trial court found that the defendant had no constitutional right to the records and quashed the subpoena. *Id.* at 341-42. Before this court, the defendant argued that the trial court should have conducted an *in camera* review of the documents to determine whether they contained material information. *Id.* at 342. This court found that due process did not require an *in camera* review, in part because the counselor-patient statutory privilege was "unqualified." *Id.* at 347. Thus, *Foggy* was faced with an issue unresolved by *Ritchie*: whether an absolute privilege must yield to a criminal defendant's pretrial discovery request for otherwise privileged information that may provide material for use in cross-examining witnesses. But the fact that the subpoenaed materials were absolutely privileged was not the only reason this court in *Foggy* held that the trial court was not obligated to conduct an *in camera* review. We also observed that "[i]t is important to note that in this case the defendant's request for an *in camera* inspection of the counseling records was merely general; he did not allege that information may exist in the counseling files that would be subject to disclosure." *Id.* at 349. The defendant's failure to give any indication that the victim's communications with the counselor would provide a source of impeachment, combined with the "strong policy of confidentiality," led the court to hold that *in camera* review was not required. *Id. Foggy* thus recognized that the strength and specificity of a defendant's request for *in camera* review was relevant to whether due process required such review.

¶ 68 There are several good reasons supporting the rationale of *Foggy*. First, as previously noted, *Ritchie*—after balancing a defendant's due process right to material information against the government's interest in prohibiting the dissemination of statutorily privileged information—allowed for *in camera* review of privileged documents only after a defendant establishes "a basis for his claim that it contains material evidence." *Ritchie*, 480 U.S. at 58 n.15.

¶ 69 Second, "*in camera* review is frequently time-consuming and may tax limited judicial resources; therefore, it is not a remedy to be unstintedly granted." *United*

*States v. Garcia-Martinez*, 730 F. App'x 665, 673 (10th Cir. 2018) (citing 6 Wayne R. LaFave *et al.*, Criminal Procedure § 24.3(b), at 447 (4th ed. 2015) ("*in camera* inspection can impose an intolerable burden on already taxed judicial resources" (internal quotation marks omitted))); *Stripling*, 401 S.E.2d at 505 ("an in camera inspection can become a ponderous, time consuming task if utilized in every case merely on demand" (internal quotation marks omitted)).

¶ 70    If automatic *in camera* review is to be the rule now going forward after the majority's decision, the strain on the judicial system's limited resources will be significant, as the rule would apply not only to the DCFS confidentiality requirement asserted here but also to any similar statutory privilege, such as privileged school records (see *People v. K.S.*, 387 Ill. App. 3d 570, 573 (2008)), juvenile records (see *People v. Clark*, 55 Ill. App. 3d 379, 387 (1977)), or Illinois Department of Corrections records (see *People v. Deleon*, 227 Ill. 2d 322, 328 (2008)). In each instance, the trial court would be obligated to conduct a potentially time consuming and burdensome *in camera* review. And, because the court's duty to disclose material evidence "is ongoing *** as the proceedings progress" (*Ritchie*, 480 U.S. at 60), trial courts will be forced to constantly revisit or reassess the privileged evidence as new arguments or theories arise at trial. By limiting *in camera* review to those instances where a defendant can make an initial showing that the privileged records might contain material evidence, the *Ritchie* rule directs a court's limited resources to potentially meritorious requests.

¶ 71    Third, a rule of automatic *in camera* review ignores that the trial court will often lack sufficient information—*e.g.*, whether the complainant will testify at trial or what the substance of that testimony would be—at the pretrial stage to adequately determine the defendant's need for the privileged information (see *Peseti*, 65 P.3d at 133) and would require the court to assume the role of an advocate (see *United States v. Zolin*, 491 U.S. 554, 571 (1989) (noting that "[a] blanket rule allowing *in camera* review" places a burden "upon the district courts *** without open adversarial guidance by the parties" and turns courts into "unwitting (and perhaps unwilling) agents" of the party seeking the review); see also *Dennis v. United States*, 384 U.S. 855, 875 (1966) ("In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate.")). Tasking judges with this advocacy responsibility is contrary to their proper role as neutral arbiters. See *Commonwealth*

*v. Dwyer*, 859 N.E.2d 400, 418 (Mass. 2006). By requiring a defendant to make an initial showing of some basis or plausible showing of materiality, the *Ritchie* rule avoids this dilemma and confirms the trial court's proper role as arbiter rather than advocate.

¶ 72 Fourth, automatic *in camera* review fails to give proper weight to the interest in maintaining the confidentiality of records that the legislature has determined should be kept confidential. To be sure, this interest in confidentiality must give way to a defendant's due process rights, but a defendant's due process rights are implicated only if the privileged matter contains material evidence. Without requiring a defendant to articulate some basis to believe that a privileged record might be material, a trial court's *in camera* review would be instigated on mere conjecture and would risk the unnecessary disclosure of the privileged material in question (see *Peseti*, 65 P.3d at 133), thereby frustrating legitimate interests in confidentiality.

¶ 73 Defendant's arguments in support of his contention that *Ritchie* created an absolute right to *in camera* review of privileged documents are not persuasive. Defendant contends that the Supreme Court's statement—that "*Ritchie*, of course, may not require the trial court to search through the CYS file without first establishing a basis for his claim that it contains material evidence"—was merely an instruction applicable on remand in that case, and intended as a guide to the trial court's assessment of materiality while performing the *in camera* review on remand, not setting that specificity as a bar to earning *in camera* review. But, as the cases I have cited above illustrate, the vast majority of courts to consider the question have held that *Ritchie*'s clear statement is applicable outside of the remand context. For good reason, too, because any attempt to characterize *Ritchie*'s rule as merely an instruction to guide the court on remand directly contradicts the Court's express statement, of course, that defendant must at least make some plausible showing to establish a basis for the claim before the trial court is tasked with searching through the files.

¶ 74 Both the defendant and the majority rely on *People v. Bean*, 137 Ill. 2d 65 (1990), to support their desired outcome. But that reliance is misplaced. In *Bean*, a defendant charged with murder sought the mental health records of a testifying witness. *Id.* at 89-90. After reviewing the records *in camera*, the trial court

disclosed some, but not all, of their contents, and the defendant later argued before this court that the trial court had erred in declining to disclose all the information. *Id.* at 91, 93. Relying on *Ritchie*, *Bean* rejected the defendant's argument and held that the trial court's decision to conduct an *in camera* review and disclose only those documents it deemed material did not deprive defendant of his due process rights. *Id.* at 99-101. But *Bean* does not answer the question presented here, because it was not asked to determine whether the defendant was required to make an antecedent, "plausible showing" of materiality before the trial court conducted its *in camera* review or whether, absent a showing, the trial court could properly have quashed the subpoena seeking those documents without conducting such a review. While *Bean* appeared to approve of the trial court's use of *in camera* review in that case, it was not asked to and did not address the showing required to trigger an *in camera* review.

¶ 75    The majority's reliance on *People v. Escareno*, 2013 IL App (3d) 110152, ¶ 18, is unavailing as well. In that case, the appellate court held that the trial court's failure to conduct an *in camera* review was error, believing that *Ritchie* created a legal obligation for the trial court to conduct an *in camera* review whenever privileged materials are subpoenaed. *Id.* ¶¶ 18-21. But, for the reasons explained, *Escareno*'s understanding of *Ritchie* is incorrect and should not be adopted, as *Ritchie* requires that a defendant desiring *in camera* review of confidential records make an initial, plausible showing of materiality and does not condone automatic review.

¶ 76    I turn to the precise standard to be used in determining whether *in camera* review is warranted and whether that standard was met in this case. At the outset, I recognize that "trial courts cannot realistically expect defendants to articulate the precise nature of the confidential records without having prior access to them." See *Gagne*, 612 A.2d at 901; see also *Stampe*, 994 F.3d at 771 ("[B]efore disclosure a defendant likely will not know the content of an undisclosed item."). Although *Ritchie* did not give trial courts "detailed guidance" on this issue (*Hummel*, 483 N.W.2d at 72), most courts, as mentioned above, have settled on the " 'plausible showing' " standard (*Ritchie*, 480 U.S. at 58 n.15 (quoting *Valenzuela-Bernal*, 458 U.S. at 867, for the proposition that a defendant " 'must at least make some plausible showing of how their testimony would have been both material and favorable to his defense' ")). Under this standard, a defendant must "make a

plausible showing that the privileged record at issue contained material evidence." *Dietrich*, 701 F.3d at 1196; see also *Abdallah*, 911 F.3d at 217 (" 'a defendant need only make "some plausible showing" that exculpatory material exists' " (quoting *United States v. King*, 628 F.3d 693, 703 (4th Cir. 2011))). The plausible showing standard does not "require 'a particularized showing of what information' " is sought (*Stampe*, 994 F.3d at 771 (quoting *Ritchie*, 480 U.S. at 58 n.15)) but requires a defendant to nevertheless " 'identify the requested confidential material with some degree of specificity' " (*Abdallah*, 911 F.3d at 218 (quoting *King*, 628 F.3d at 703)).

¶ 77    Applying that standard here, it is clear defendant failed to make a plausible showing that the unfounded DCFS report contained material information. The trial court therefore did not abuse its discretion in quashing the subpoena without conducting an *in camera* review. See *People v. Williams*, 209 Ill. 2d 227, 234 (2004); *People v. Arze*, 2016 IL App (1st) 131959, ¶ 104 (trial court's decision to quash subpoena without conducting *in camera* review is reviewed for an abuse of discretion). Defendant's subpoena demanded all records of investigations including but not limited to written reports and video or audio recordings created since September 1, 2018, related to Mercedes (L.G.P.'s mother) or Angel Walker (Mercedes's friend), but it made no allegation that the records pertained to L.G.P. and made no effort to explain why the documents might otherwise contain information material to the criminal proceedings against defendant. Then, at the hearing on DCFS's subsequent motion to quash, defense counsel argued that the report could show "interest and bias." Counsel attempted to explain as follows:

> "[T]he mother of the accuser and her girlfriend, both of which defense, based on our research believes—well, it goes to interest and bias of the—of the mother of the children who allegedly made these or who made these allegations, and her girlfriend who we believe are playing a part in—in this, and that goes to not only interest and bias, but if there's contradictory statements, that would certainly be *Brady* material as well."

¶ 78    Clearly, the defense speculated that the DCFS report might contain information showing the "interest and bias" of Mercedes and her friend, but it did not explain even remotely how that information might be material to the criminal proceedings against defendant (such as, for example, by explaining why they might be biased

against him or what they were "playing a part in"). Similarly, defendant suggested that the report might contain "contradictory statements" but provided no explanation why he believed this was so or what the statements might contradict. The trial court was thus presented with no nonspeculative reason to believe that the DCFS report might plausibly contain material information.

¶ 79     The majority claims that "[t]his case is on all fours with the facts in *Ritchie*, *Bean*, and *Escareno*." *Supra* ¶ 48. But that is not an accurate assessment. In *Ritchie*, the defendant sought records concerning his daughter's abuse, the same daughter that was the victim in the current charges before the court, as well as an earlier report by an unidentified source that defendant's "children were being abused." *Ritchie*, 480 U.S. at 43. Unlike *Ritchie*, defendant in the present case never connected the unfounded investigation of Mercedes and Angel to the current charges, the alleged victim of those charges, or even his child.

¶ 80     *Escareno* is distinguishable for the same reason. In *Escareno*, the defendant sought DCFS records related to his own abuse of the victim, as well as a report of that same victim's allegations against another individual. *Escareno*, 2013 IL App (3d) 110152, ¶ 18. Moreover, the appellate court in *Escareno* mistakenly believed that *Ritchie* created an obligation to conduct *in camera* review whenever privileged materials are subpoenaed. See *id.* ¶¶ 18-21. Finally, *Bean*, 137 Ill. 2d 65, is also distinguishable. There, this court did not answer the question presented here, as it was not asked, and did not address whether defendant was required to make a plausible showing prior to the trial court allowing *in camera* review.

¶ 81     I believe the trial court was well within its discretion to conclude that the DCFS report was immaterial to defendant's case. The DCFS investigation was not aimed at defendant but at defendant's victim's mother and the mother's friend. Further, the report was classified as "unfounded," meaning that the investigation uncovered "no credible evidence" of abuse. See 325 ILCS 5/8.1 (West 2018). And, as the appellate court noted, the victim of the alleged abuse was never identified. See 2021 IL App (4th) 190667-U, ¶ 10. I would therefore find that the trial court could reasonably conclude that an investigation into the allegations of a victim unrelated to defendant's case would not plausibly contain evidence material to defendant's case. For all the reasons noted, the unfounded report appears to be wholly immaterial to defendant's case, and absent a plausible showing to the contrary, the

trial court appropriately exercised its discretion to quash the subpoena without conducting an *in camera* review.

¶ 82    Accordingly, I dissent.

¶ 83    CHIEF JUSTICE THEIS joins in this dissent.