2025 IL App (1st) 241381-U

No. 1-24-1381

Order filed December 3, 2025

Third Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 MC 1189689 |
| | ) | |
| MIISHA HAMPTON, | ) | Honorable |
| | ) | Joseph M. Gump, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE MARTIN delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: Evidence was so unsatisfactory that a reasonable doubt of the defendant's guilt remained.

¶ 2    Miisha Hampton appeals her convictions for aggravated assault (720 ILCS 5/12-2(c)(1) (West 2022)) and harassment by telephone (720 ILCS 5/26.5-2(a)(2) (West 2022)) following a bench trial. For the following reasons, we reverse.[1]

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 3                                    I. BACKGROUND

¶ 4          Lester Ellis testified he was employed in building maintenance at an apartment complex. On June 23, 2023, Ellis was speaking with his supervisor, Lashawn Matthews, about his after-work plans. Ellis stated he planned to watch Netflix and have a drink. Matthews jokingly implied Ellis should have some female company. Hampton, a coworker, was within earshot of the conversation. She interjected, saying "yeah, because I be giving [Matthews] oral sex." Ellis felt the comment was inappropriate and responded, "You nasty. You kiss your husband with that *** mouth? That's trifling."

¶ 5          Sometime later, the three walked to Hampton's car. After entering the driver's seat, she produced a handgun and pointed it at Ellis, who stood about six feet away, speaking with someone on his mobile phone. He noticed the handgun was a brownish and beige semiautomatic. Hampton did not speak but had a "mean look." Ellis asked her why she was pointing a gun at him and walked away. Ellis testified he was afraid for his life and unsure whether Hampton would shoot him. After this incident, Ellis felt unsafe having to work with Hampton.

¶ 6          A few days later, on June 29, Ellis was speaking with the property manager, Mr. Lucas, inquiring about a change in assignment. Hampton entered the room "irated [*sic*]," pointing at Ellis, and saying he should not have said things about her.

¶ 7          On the evening of July 3, 2023, Ellis was at his home and received a call on his cellphone from a number hidden by the star 67 feature. Ellis answered and recognized Hampton's voice. Hampton stated she was going to "beat [his] ass and kill [him.]" Hampton knew Ellis's phone number since Ellis had previously exchanged text messages with her. Her statements made Ellis "very uncomfortable" and believed she had threatened his life. At some point, Ellis obtained an order of protection against Hampton.

¶ 8    On cross-examination, Ellis testified he was fired from his job on July 5, 2023, after Hampton complained that he had sexually harassed and threatened her. Ellis stated that Hampton lied, his employer fired him without investigating her complaints, and he hired a lawyer to pursue recourse. He also clarified that Matthews was present at the June 23 incident when Hampton allegedly pointed a gun at him. Ellis admitted he had no telephone records to corroborate the July 3 phone call he received from Hampton.

¶ 9    The majority of Ellis's cross-examination, however, concerned when Ellis reported the alleged incidents to police. Ellis testified he was "absolutely certain" that he went to a police station "the day it happened" because he was "scared for [his] life." He specified that day was June 23 and he spoke with Officer Nicholas Killham. Ellis also insisted that he did not go to a police station on July 3. On July 6, he received a phone call from Detective Jerome Balling. The detective came to Ellis's apartment sometime later to speak with him in person. Ellis testified he informed the detective that he had been fired from his job. In response to counsel's question, Ellis denied that he reported the gun incident with Hampton had occurred at his apartment instead of his workplace.

¶ 10    The State rested after Ellis's testimony and the court denied Hampton's motion for a directed finding.

¶ 11    Hampton called Detective Balling. Detective Balling was assigned to investigate Ellis's report on July 6. After reviewing records to refresh his recollection, he testified that Ellis reported the June 23 incident on July 3. Detective Balling first spoke with Ellis by telephone and later visited him at his home due to "inconsistencies" between the case report and what Ellis stated during their phone conversation. Ellis informed the detective that he had been fired from his job, though he was unsure whether Ellis did so during their initial phone conversation or their later in-

person meeting. Ellis also reported that the gun incident occurred at his workplace and Detective balling spoke with Ellis's coworkers.

¶ 12    Hampton also called Officer Killham. Officer Killham testified that Ellis came to the Third District police station at 6:30 p.m. on July 3, 2023, where Officer Killham took Ellis's report. Ellis reported that he had received a threatening phone call from Hampton and that she had previously pointed a gun at him in June. Ellis stated the gun incident occurred outside "the apartment building." Officer Killham obtained the address of the building from Ellis's driver's license. Ellis did not indicate that he had made a prior report and there was no record of Ellis making a report before July 3.

¶ 13    In closing, defense counsel argued the case was "riddled with inconsistencies." He noted that the alleged gun incident was initially reported to have occurred at Ellis's home, not his workplace, as Ellis had testified. Counsel also noted that Ellis did not make a police report until ten days after the alleged gun incident when he received the alleged threatening phone call. The delay in reporting was "inexplicable," according to counsel, since the gun incident would have been much more threatening.

¶ 14    The court made lengthy remarks in ruling:

"The testimony regarding Mr. Ellis seemed to indicate, of course, that the defendant, Ms. Hampton, was involved in a conversation with he and Lashawn Matthews, who is a coworker[.]

***

The testimony Mr. Ellis gave was that during the conversation, Ms. Hampton had made some comments to him apparently in the presence of, I'm not sure, Lashawn Matthew[s] that made him uncomfortable regarding maybe some kind of sexual contact

that she claim[ed] to have had with Mr. Ellis. And this occurred on June 23rd, according to the testimony that I heard. And then at which point, according to the testimony that I heard, that Ms. Hampton—Mr. Ellis tried to make light of it, although he said he felt uncomfortable about these comments that were made in front of another employee, Mr. Matthew[s]. And eventually, from the testimony that I heard from Mr. Ellis, is that Ms. Hampton walked away from that conversation, went to her car. And Mr. Ellis apparently followed Ms. Hampton to her car; was approximately six or seven feet away, at which point, allegedly, according to his testimony, Ms. Hampton pulled a gun out and made a threatening remark to the effect that Mr. Ellis felt he was in danger of being perhaps physically harmed or shot. And this occurred, again, on the 23rd of June. And it appeared without any doubt in my mind that Mr. Ellis was pretty certain that it occurred at his place of employment.

\*\*\*

You know, honestly, there was no—there was no police report that I heard about that was written on June 23rd, although, according to Mr. Ellis's testimony, he—let's see.

He reported that incident to the police on June 23rd, but there is no police report. I find that very unusual, because, clearly, if that occurred, that there was an allegation such as that, I would have thought there would have been a police report that would have corroborated it; and there wasn't. And neither Detective not Police Officer Killham was able to find such a police report or considered such a police report at the time that Mr. Ellis went to the police on July 3rd and contacted them about the threatening phone call that he had received from a person who he believed was the defendant, Ms. Hampton.

And, as [defense] counsel, *** pointed out, not only was there not a report from June 23rd of a threatening phone call allegedly received by Mr. Ellis on July 3rd, there was no record of that phone call as well, although Mr. Elis did contact the police on—from my recollection of the testimony, he did contact the police and spoke to *** Police Officer Killham on July 3rd; and he spoke to Officer Killham and mentioned at that time he had mentioned the telephone threat. But it was somewhat confusing regarding—and then he also at that point—he didn't initially mention that June 23rd incident, but Officer Killham mentioned he had a conversation outside the apartment building regarding the incident.

So there was a little bit of confusion as to whether or not the firearm incident occurred outside of that apartment building that Officer Killham spoke about or the place of employment. And, as I said, there was no police report to reflect the June 23rd incident.

What I am a little confused about in this incident was that there was a potential witness that Detective Balling mentioned that he spoke to after being assigned the case July 6th. And Detective Balling allegedly spoke to the complaining witness, Mr. Ellis, over the phone. And then apparently, I think on July 9th he spoke to him in person, and that Detective Balling apparently also spoke to another coworker. I assume that although there was no testimony to the effect, it may have been Lashawn Matthew[s] who is the coworker that was present during the original conversation, and Ms. Hampton. That witness was not called.

I will say that Mr. Ellis did indicate, and testified credibly, I thought, about having a gun pulled on him on June 23rd. And on July 3rd he testified as well, I thought, pretty credibly that he received a phone call from somebody he believed to be Ms. Hampton based

upon his knowledge and familiarity with Ms. Hampton's voice wherein Ms. Hampton indicated that 'I'm going to beat your ass.' 'I'm going to kill you.'

Now, subsequent to this, though, it appears as if Mr. Ellis was discharged from his place of employment where he previously worked with the defendant. And that was based upon, according to what he testified to, an allegation that the defendant made a claim of sexual harassment against Mr. Ellis. After that he was let go on—I believe it was on July 6th. So that would have been after the complaint that was made on July 3rd.

I can say there was some confusion. I agree with what Mr. Lewis said about the fact that it was surprising that there would have been a delay from June 23rd to July 3rd before—when Mr. Ellis reached out to the police, and then only after he received that alleged threatening call. But, according to the State, the reason for that delay was that Mr. Ellis testified that he was afraid of going to police because he had been threatened with a gun while he was at work.

So basically—I believe, though, ultimately I heard the testimony of Mr. Ellis. And while there was no initial outcry on June 23rd—but it was actually no police report written on June 23rd—there is reference to the allegations that occurred on June 23rd in a subsequent police report. I don't blame Mr. Ellis for the failure to have a report dated June 23rd, because it was mentioned ultimately in another report, so he did make that claim.

Also *** he made that comment to Detective Balling that he had been discharged. And that occurred either when Mr. Ellis spoke to Detective Balling on the 6th of July or when they had an in-person meeting on July 9th.

All things considered, there is some confusion in this matter relative to the police reports. But I'm going to come down on the side that I thought that Mr. Ellis testified

convincingly. And I feel that, based upon his testimony, I think that I will find [Hampton] guilty on the charge of the aggravated assault as well as the harassment by telephone."

¶ 15     Defense counsel made an oral motion for new trial. As before, counsel argued there were "too many inconsistencies." He noted that there was conflicting information as to where the gun incident occurred and whether Ellis made a report on June 23. Counsel also reiterated the lack of evidence to corroborate Ellis's testimony.

¶ 16     In response, the court remarked that the case was close and "a bit confusing," but it was persuaded by Ellis's testimony. The court reiterated that it found Ellis's testimony credible. The court commented that it would have liked to have heard from Matthews and seen telephone records but, nevertheless, it found Ellis credible. The decision was based on Ellis's testimony, the court explained, which it found "sufficient."

¶ 17     After hearing from the parties regarding sentencing, the court sentenced Hampton to six months of supervision and required her to undergo anger management and complete 50 hours of community service. This appeal followed.

¶ 18                                   II. ANALYSIS

¶ 19     Among other contentions, Hampton argues that Ellis's testimony was not credible and, therefore, insufficient to prove her guilt. We agree.

¶ 20     "When reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Cline*, 2022 IL 126383, ¶ 25. "A reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Sauls*, 2022 IL 127732, ¶ 52.

"Although these determinations by the trier of fact are entitled to deference, they are not conclusive. Rather, a criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 21        Here, we find that even viewing the evidence in the light most favorable to the State, the evidence is so unsatisfactory that a reasonable doubt of Hampton's guilt remains. With no corroborating evidence, the State's case relied entirely on Ellis's credibility. The positive, credible testimony of a single witness is sufficient to convict a defendant. *Sauls*, 2022 IL 127732, ¶ 52. But the evidence here was insufficient for a rational tier of fact to find Ellis credible.

¶ 22        First, the trial court relied on erroneous recollections of the evidence in making its credibility determination. In its remarks, the court recalled that Hampton made a statement about a sex act with Ellis, that Hampton made a threatening remark when she pointed a gun at Ellis, and that Ellis testified he did not report the gun incident as "he was afraid of going to police because he had been threatened with a gun while he was at work." None of these recollections were accurate. Ellis testified that Hampton referred to a sex act with Matthews, not him. He also said she did not speak but gave a "mean look" when she pointed the gun at him. And, most significant, Ellis was adamant—"absolutely certain"—that he reported the gun incident after work on June 23, the day he said it occurred.

¶ 23        Indeed, Ellis indicated the threat he felt compelled him to report the incident immediately. Yet, the court stated the threat to his life was the reason Ellis did *not* report it—the opposite of Ellis's actual testimony. Further, the court relied on this inaccuracy to dismiss the 10-day delay in reporting and contradiction by the police officers as factors weighing against Ellis's credibility. But those factors did weigh against Ellis's credibility. Ellis was insistent that he went to the police

station and reported the gun incident after leaving work on June 23 and did not go to the police station on July 3. Both police officers gave evidence establishing the opposite. This was not merely "confusing." Ellis's testimony on these points was impeached and positively rebutted.

¶ 24    Similarly, the trial court stated that Detective Balling spoke with a "potential witness" who it inferred to be Lashawn Matthews. But Detective Balling only indicated that he spoke with coworkers. He did not identify any coworker he spoke with or indicate whether they witnessed anything. The court's phrasing suggests it might have believed that a witness who did not testify corroborated Ellis's account. In any event, we cannot defer to the trial court's credibility determination when the court made multiple inaccurate recollections of the evidence.

¶ 25    Further, in denying the motion for new trial, the court stated it would have liked to have heard from Lashawn Matthews and noted that telephone records are routinely subpoenaed. These statements contradict the court's finding that Ellis's uncorroborated testimony was sufficient and weigh against deferring to the court's credibility determination. Although corroborating evidence is generally not required, the impeachment of Ellis's testimony amplified the significance of the absence of such evidence. *People v. Herron*, 2012 IL App (1st) 090663, ¶ 23. More so, considering that, as the court observed, corroborating evidence would have been readily available. Ellis identified a third-party eyewitness to the gun incident and easily obtainable records from his mobile phone provider could have at least verified a star 67 call on July 3 if it occurred. Thus, under the circumstances of this case, a reasonable doubt of Ellis's credibility and, therefore, Hampton's guilt remained due to the lack of corroborating evidence.

¶ 26    In addition, the inconsistency as to where the alleged gun incident occurred remained unresolved. Ellis testified that this occurred at his workplace. But Officer Killham listed Ellis's home address as the location, suggesting Ellis's reported that it occurred there. The State failed to

clarify or resolve this issue. Detective Balling testified he interviewed Ellis in person due to discrepancies between the written report and Ellis's telephone conversation with him. The trial never elicited what the discrepancies were and whether they were resolved.

¶ 27      Lastly, even by his own account, Ellis and Hampton had an ongoing conflict and her complaint led to termination of his employment. In testifying about the June 29 incident, Ellis also established he was aware that she was complaining about him before he made a police report on July 3. So, even if Ellis was terminated after he made a police report, the record failed to dispel that Ellis had a motive to make a false report.

¶ 28      In sum, we find the evidence was so unsatisfactory that a reasonable doubt of Hampton's guilt remains. Thus, we reverse her conviction on both counts.

¶ 29                 III. CONCLUSION

¶ 30      Based on the foregoing, the judgment of the circuit court is reversed.

¶ 31      Reversed.