2026 IL App (2d) 250008-U
No. 2-25-0008
Order filed March 2, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v. RICARDO LEMOS, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable Bianca Camargo, Judge, Presiding.
No. 23-CF-854

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not err in barring defendant's witness from identifying K.M.'s prior vaginal delivery as a possible cause of the vaginal tear, where the opinion would be purely speculative. The trial court also did not err in denying defendant's discovery request for K.M.'s medical records from her vaginal delivery, where defendant did not show those records would be admissible and where the records were too remote from the date of the assault to be relevant.

¶ 2   Defendant, Ricardo Lemos, alleges that the trial court erred by (1) barring his expert witness from identifying K.M.'s prior vaginal delivery as a possible cause of the vaginal tear; and (2) by denying his discovery request for K.M.'s medical records from her vaginal delivery. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    On June 22, 2023, defendant was charged via indictment with two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2022)), a class 1 felony. He was accused of sexually assaulting his niece, K.M., on or about July 2, 2022.

¶ 5    During the pendency of the case, a number of motions *in limine* were filed. Of relevance to this appeal, defendant filed a motion for additional discovery on August 9, 2024. In it, he indicated that his defense expert sent the following email:

> "I am requesting OB/GYN records for KM related to her obstetric history. As per the provided records, KM delivered a child and also had a pregnancy which ended prior to live birth. There is a note in the medical records that KM had a cerclage prior to delivery, and it is not clear if the cerclage was related to a procedure done prior to the abortion/miscarriage (from around 2 weeks prior to the alleged incident) [hereinafter, "surgical vaginal procedure"] versus a cerclage being done prior to the birth of the live child. Also not known is if Ms. Brown[1] had a history of a tear or episiotomy after giving birth. It is important to know this to evaluate if the finding indicated by the nurse, which had reported blue dye uptake, could be due to the presence of a prior procedure/birth injury versus an acute injury or anatomical variant."

Therefore, he sought leave to subpoena K.M.'s medical records related to the birth of her child and the surgical vaginal procedure, or alternatively, requested the State obtain said records and tender them.

¶ 6    Defendant filed a supplemental motion for additional discovery on September 3, 2024, again seeking K.M.'s medical records related to the birth of her child. In the motion, he additionally stated:

---

[1]It is unclear who Ms. Brown is.

"Per the expert the defense is consulting with, she needs to see the birth records to learn whether there was any specific birth trauma to the genital structures, if it was a vaginal birth. During a vaginal birth, tearing can occur naturally or during a procedure called an episiotomy, which cuts into the lower genital structures. Any potential previous injury to the area could have affected the interpretation of the findings during the forensic examination. As previously explained in the Defense Motion for Additional Discovery, during the examination of KM, Nurse Burke reported blue dye uptake, which could be due to the presence of a prior procedure/birth injury or anatomical variant."

¶ 7    The matter proceeded to hearing on defendant's motion for additional discovery on September 6, 2024. The trial court held that the medical records related to K.M.'s surgical vaginal procedure were relevant. It held that the medical records related to the birth of her child were not relevant and accordingly did not require the State to obtain and tender them:

"From my understanding of this dye is that it does react to recent injuries, and that's why I think that the termination records are extremely relevant given the timeline.

I can't wrap my head around how something that happened two years prior would be reacting to a dye. ***

At this point, I don't find that [the K.M.'s medical records related to the birth of her child] are relevant."

¶ 8    On October 4, 2024, the State made an oral motion to bar defendant's expert from testifying that K.M.'s live birth from two years prior could be a cause of her vaginal injury. The State argued that the live birth was irrelevant and barred by the rape shield and by the trial court's prior ruling, which barred defendant from obtaining K.M.'s medical records from her live birth. The trial court took the matter of under advisement. On October 9, 2023, the trial court issued its oral ruling:

"The Court has ruled that -- in a prior hearing that the Defense expert would not be able to review any medical records from a live birth two years prior. Without reviewing those reports, the Defense expert is essentially speculating as to the vaginal tearing or cutting two years ago which could have resulted in some sort of scar tissue. Without a review of those records, which the Court has barred, then it is just speculation, and that is outside of the expert's purview.

* * *

At this time, I'm going to grant the State's oral motion to bar."

A written order was entered that same day.

¶ 9    On October 17, 2024, defendant made an oral motion to clarify the trial court's October 9, 2024, order. He sought clarification to see if he was allowed to ask more general questions about how a vaginal tear would occur or generally what kind of things would cause T.B. dye to reuptake. The trial court again took the matter under advisement. On October 18, 2024, the trial court issued its ruling:

"The defendant shall be allowed to inquire with the defendant's expert the possible reasons TB Dye may reuptake and the court gives the People wide latitude to cross examine the defense expert on that issue.

To clarify the court's previous ruling as to the rape shield motion *[in limine]*, the defense shall be able to cross the People's expert as to her March 2024 opinion regarding the possible source of the vaginal tear. The People may cross examine the defense expert as to the surgical vaginal procedure not being the origin of the vaginal injury."

¶ 10    The matter then proceeded to jury trial on October 21, 2024, with the victim, K.M., being called as the State's first witness. She testified as follows. At the time of trial, K.M. was 21 years

old and had three minor children, a three-year-old, a one-year old, and a six-week-old. In July 2022, she lived in a single-family home in Aurora with her mother, sister, two brothers, and sometimes her father. On July 1, 2022, she was outside drinking with her family. Her uncle, defendant, was present. During the course of the evening, defendant, K.M., and K.M.'s cousin, Isabel Lemos, drank and used cocaine. Eventually, they ran out of cocaine so they all left in defendant's vehicle to obtain more. On the drive, defendant asked K.M. if she liked sex and told her he could "sex traffic" her. Once they obtained more cocaine, they drove back to K.M.'s house in Aurora. Over the course of the evening, K.M. consumed approximately three to four beers and seven to nine "bumps" of cocaine. Defendant also consumed seven to nine "bumps" of cocaine.

¶ 11 In the early hours of July 2, 2022, Isabel left, and K.M. got ready for bed. She was exhausted, as she had been up for 24 hours and her 11-month-old daughter was a "ball of energy." She got into bed with her daughter and fell asleep. Defendant and K.M.'s brother were also sleeping in the bedroom with her. She had given permission for defendant to sleep in the room.

¶ 12 When K.M. awoke, her shirt was pushed up exposing her breasts and she was not clothed from the waist down. She had been fully clothed when she went to bed. Her daughter was also crying, which was unusual. K.M. noticed pain in her vagina and the smell of sperm. Defendant was not in the room with her at this point, so K.M. gathered his belongings and put them outside the bedroom. She then shut the door and put a chair in front of it.

¶ 13 Then, K.M. saw defendant enter the room. He was shirtless and repeatedly asked her if she was okay. K.M. told him to leave the room. After the third or fourth time she told him to leave, defendant did so. K.M. then texted defendant, telling him to leave, among other things. The text messages between K.M. and defendant from the morning of July 2, 2022, were admitted into evidence as People's exhibit Nos. 14 through 19. The messages read as follows:

"K.M.: I don't want you around me or my daughter ever again you weird [REDACTED]. If I ever see you around me or my daughter we have an [*sic*] huge problem. Mfs will know what u did. So you might as well stay away from here from now on

K.M.: U bogus asf for that shit seriously

K.M.: If you felt like you were going to pretty much fucking rape me you should've got tf out my house. You did that shit in front of my daughter

Defendant: I apologize i [*sic*] didn't mean no harm

K.M.: What the fuck you mean you ain't mean no harm. I woke up in pain and smell like cum.

Defendant: I apologize I didn't mean no harm

K.M.: You really are bogus

Defendant: I apologize I didn't man no harm

K.M.: Like I said I don't want you around us no more. How do u not mean harm. You raped me ghee. You fucking violated me in front of my fucking daughter

K.M.: You need to leave the house honestly

Defendant: I was trying to go to sleep

K.M.: Nigga after you did that shit to me

K.M.: That's why you kept asking was I okay

Defendant: I was trying to go to sleep.

* * *

Defendant: I apologize i didn't mean to make you mad

Defendant: I'm sorry I didn't mean to disrespect you[.]"

¶ 14    After defendant left K.M's house, she called her mother to advise her of what had occurred. Her mother called the police, who arrived shortly thereafter. K.M gave a statement to the police and underwent a sex assault examination at Mercy Medical Center in Aurora.

¶ 15    On cross-examination, K.M. testified that it was unusual for her to fall asleep after doing cocaine, as it is an "upper." She also testified that she did not remember anyone touching her or taking off her clothes while she was asleep. She has no recollection of what happened between the time she fell asleep and the time she woke up.

¶ 16    On re-direct examination, K.M. testified that defendant had not touched her on the vagina or the anus at any point in the evening before going to bed.

¶ 17    Next, Virginia Lemos, K.M.'s mother and defendant's sister, testified as follows. In July 2022, she lived in Aurora with K.M., her two sons, and her husband. Defendant did not live with them, but he visited often. On July 1, 2022, defendant was visiting because "he got into it with his girlfriend and needed a place to stay." That evening, they were all outside in the driveway, drinking. Virginia went to bed around 9:00 or 10:00 p.m. The next morning at approximately 6:30 a.m., she received a phone call from K.M. She sounded scared and upset. She told her that defendant had raped her. Virginia then called 9-1-1.

¶ 18    Virginia accompanied K.M. to Mercy Medical Center in Aurora. They were there for approximately eight hours. During the sex assault examination, K.M. was frightened and continued to cry.

¶ 19    Detective Benjamin Grabowski with the Aurora Police Department testified next. At the time of trial, he had been an officer for 23 years and a detective for 10 years. In July 2022, he was assigned as a lead investigator in a sexual assault case involving K.M. and defendant. On January

3, 2023, he met with defendant and obtained a buccal swab, pursuant to a search warrant. The envelope containing the buccal swab was entered into evidence as People's Exhibit no. 32.

¶ 20   Officer Bart Palaszewski with the Aurora Police Department also investigated the case. On July 2, 2022, he responded to a 9-1-1 call and met with K.M. and her father. K.M. told him what had happened and identified defendant as the perpetrator. During their interaction, K.M. was hysterical and scared.

¶ 21   Melissa Burke, R.N., was tendered as an expert in the field of sexual assault nurse examination and treatment. She was the sexual assault examiner on the case involving K.M. and defendant. She conducted the sexual assault examination on K.M. During the examination, K.M. was very withdrawn, tearful, and upset. K.M. explained that her memory was very limited during the actual assault, but she experienced pain in the genital area. Specifically the area known the posterior fourchette, which is the most commonly injured area in sexual assault cases. There was also dried blood on her inner thighs. The night of the assault, K.M. ingested alcohol and cocaine.

¶ 22   As part of the sexual assault examination, Burke used a sexual assault examination kit from the Illinois State Police. She completed the step-by-step protocol required to properly conduct the examination. In addition to swabbing the affected areas, Burke also conducted a visual examination of K.M. She did not see any outward injury or trauma to her vagina. However, this was not unusual as a lot of injuries involved in a sexual assault are not visible to the naked eye. To better view any existing injuries, Burke applied toluidine blue dye (hereinafter "T.B. dye"). T.B. dye is a special tool used in sexual assault examinations that helps examiners highlight genital injuries otherwise not visible with naked eye. Upon applying the T.B. dye during her examination of K.M., Burke observed "reuptake at the 6 o'clock area of the posterior fourchette with tenderness and pain noted to that area." This means that area contains damaged cells. The T.B. dye stained

that area because of damage to those cells. The injured area was approximately one and a half centimeters.

¶ 23 Burke testified that vaginal tears may be caused by nonconsensual sex. In her expert opinion, the vaginal tear observed on K.M. using the T.B. dye was consistent with blunt vaginal penetration. Regarding the timing of the injury, her expert opinion was that the injury occurred within 24 to 48 hours.

¶ 24 On cross-examination, Burke testified that the dried blood on K.M.'s thighs could be a result of K.M. being on her period or bleeding from the vaginal surgical procedure K.M. received about two weeks before the alleged incident.

¶ 25 Burke also testified that it is possible for T.B. dye to get caught on the skin in a fold or a wrinkle. However, she is trained to detect the difference between an actual injury and any remnants or residue of the dye. While the vaginal tear observed on K.M.'s vagina could be caused by nonconsensual intercourse, it may also occur with consensual intercourse.

¶ 26 On March 27, 2024, Burke had a phone call with the State to provide her opinions on the results of the sexual assault examination. She indicated that the trauma observed on K.M.'s vagina was consistent with vaginal penetration *or* with a prior medical procedure. She did not have access to her documentation during this phone call. During a second phone call with the State on June 11, 2024, Burke amended her opinion, indicating that the tear was *not* attributable to the surgical vaginal procedure K.M. had two weeks prior to the alleged assault. Burke explained that her opinion was amended because she had access to her documentation during her second call.

¶ 27 Laurie Lee, a forensic scientist with the Illinois State Police at the Rockford Forensic Science Laboratory, was tendered as an expert in the field of forensic DNA analysis. She testified as follows. Lee was assigned to conduct the DNA analysis in the case involving K.M. and

defendant. She received the sexual assault kit which included a buccal swab, vaginal swabs, and anal swabs. For the vaginal swabs, Lee determined there was "a mixture of two contributors which was a major female profile *** and a minor profile at four STR loci." Based on her findings, there was the possibility of comparing the minor profile to a proper known standard. For the anal swabs, Lee determined the sample contained DNA from two people, "a major female profile *** and a minor male profile at five STR loci." Again, there was the possibility of comparing the minor profile to a proper known standard. For both the vaginal and the anal swabs, the major female profile was compared to K.M.'s buccal swab, and it was determined that K.M. was included as a contributor for the major female profile.

¶ 28 Rachel Brichetto, a forensic scientist with the Illinois State Police at the Rockford Forensic Science Laboratory, was also tendered as an expert in the field of forensic DNA analysis. She testified as follows. Brichetto was assigned to conduct the DNA analysis on defendant's buccal swab, and compare the reference sample to the unknown sample of male DNA in K.M.'s vaginal and anal swabs. She concluded that defendant cannot be excluded and is included in the unknown profile for both swabs. For the vaginal swabs, the probability of selecting an unknown profile from a random population of unrelated individuals is 1 in 98. For the anal swabs, the probability of selecting an unknown profile from a random population of unrelated individuals was 1 in 140

¶ 29 On cross-examination, Brichetto explained that the terminology in the field is to say an individual's DNA is "included," not that it's a "match." She also testified about DNA transference. Transference of DNA following sex can be substantial.

¶ 30 The State rested. Defendant proceeded with his case-in-chief, calling Detective Benjamin Grabowski as his first witness. He testified as follows. He was assigned to be lead detective in the case involving K.M. and defendant. During the investigation, he interviewed K.M. She told him

that the morning of July 2, 2022, she awoke to the sound of her door squeaking. She saw defendant walking down the hallway, shirtless. She also told Detective Grabowski that when defendant returned to her bedroom, he pleaded with her to go to sleep.

¶ 31    Detective Grabowski never had a Cellebrite analysis done on K.M.'s cell phone. Cellebrite is "a machine [that] plugs into a computer. It will then download the contents of a cell phone giving you all of the information as far as *** call logs, text message content, contacts, e-mail history, location data ***." It also is able to capture things that have been deleted off the cell phone.

¶ 32    Defendant then called Tristan Wristen, with TW Forensic Consulting. She testified via Zoom, a videoconferencing platform, as her schedule did not allow her to be physically present to testify. She was tendered as an expert in forensic nursing and sexual assault examinations, and testified as follows. To conduct her consultation, Wristen reviewed police records, EMS records, emergency department records, forensic nurse examination documents, photographs, and some of K.M.'s medical records before the alleged incident. Based on her review of the records, Wristen concluded that Melissa Burke improperly used the T.B. dye during K.M.'s sexual assault examination. In Wristen's expert opinion, T.B. dye is meant to enhance a visible injury, not to be used to search for an injury and in the instant case, the T.B. dye was applied improperly. Because of this, she cannot say whether or not an injury was present.

¶ 33    Defendant, Ricardo Lemos, testified next. He testified that on July 1, 2022, he had gone to his sister Virginia's house in Aurora because he and his girlfriend had gotten into an argument. He arrived at the house around 4:00 or 5:00 p.m. When he arrived, K.M., her mother, and three other family members were outside drinking. At some point in the evening, K.M. asked him for cocaine. He shared his cocaine with her after denying her twice. Eventually, the cocaine ran out. He, K.M., and Isabel went to obtain more. When they returned to the house in Aurora, they continued

drinking. K.M. and defendant used cocaine in her room. They did not go to sleep that night, though they both laid down. Defendant was on the floor, K.M. was on her mattress. He was not aware that K.M.'s baby was present at this time.

¶ 34    As they were laying down, defendant was texting his girlfriend. He noticed that K.M. was watching what sounded like a pornographic movie. She then got on top of him. She was not wearing bottoms and she had pulled her shirt up. Defendant shoved K.M. off of him. She landed on the baby, who started to cry. K.M. was angry and started yelling at defendant. He asked if she was okay because she was "tripping off the cocaine" and behaving abnormally. K.M. asked defendant to go downstairs and he obliged.

¶ 35    While downstairs, he texted K.M. to see if she was okay. The text messages that had previously been admitted into evidence as People's Exhibit nos. 14 through 19 did not show the whole exchange of messages. He also explained that he was apologizing for pushing K.M. off of him and causing the baby to cry.

¶ 36    Defendant testified that he did not rape K.M. He did not touch her in "any type of sexual way."

¶ 37    On cross-examination, defendant denied asking K.M. about sex or making any sort of comment to her about sex trafficking.

¶ 38    The defense then rested, and the State called one witness, Melissa Burke, in rebuttal. She testified that she disagreed with Wristen's opinion that T.B. dye should only be used to highlight visible injuries. Based on her experience and training, she properly applied T.B. dye to an area of pain and tenderness, which showed a tear in K.M.'s vagina at the 6 o'clock portion of the posterior fourchette.

¶ 39    The State then rested. The parties proceeded to closing argument and then the jury was sent for deliberation. It returned a guilty verdict on count 1 (criminal sexual assault – vaginal penetration), and a not guilty verdict on count 2 (criminal sexual assault – anal penetration). The matter was continued until December 20, 2024, for post-trial motions. Relevant to this appeal, defendant argued in his post-trial motion that the trial court erred (1) in denying his motion for additional discovery, seeking K.M.'s medical records from the vaginal procedure two weeks before the rape and from the birth of her child; and (2) in barring the defense from asking their expert whether the T.B. dye could have highlighted an injury that occurred during the birth of her child. After hearing arguments, the trial court denied defendant's post-trial motion. Defendant was sentenced to 13 years' imprisonment in the Illinois Department of Corrections. He filed his timely notice of appeal on January 7, 2025.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, defendant argues that the trial court erred by (1) barring his expert witness from identifying K.M.'s prior vaginal delivery as a possible cause of the vaginal tear; and (2) by denying his discovery request for K.M.'s medical records from her vaginal delivery. In response, the State argues the trial court did not err, and even if it did err, that error was harmless. For the following reasons, we affirm.

¶ 42    In support of defendant's first argument—that the trial court erred by barring his expert witness from identifying K.M.'s prior vaginal delivery as a possible cause of the vaginal tear— defendant first contends that his expert's proposed testimony was directly relevant to the ultimate issue of whether or not penetration occurred. Additionally, since the basis of the opinion would have been medical records relied on by experts in her field, defendant's expert's opinion would not be speculative. The State, in response, argues that the proposed testimony would be purely

speculative. We agree with the State. It is well established that "[a] trial court may reject evidence on the grounds of relevancy if it is remote, uncertain, or speculative." *People v. Cloutier*, 156 Ill. 2d 483, 501. As the State points out in its brief, defendant's second argument on appeal confirms that the first argument is entirely speculative. In his second argument, defendant claims that the medical records from K.M.'s vaginal delivery *were needed* to render an opinion on the source of the vaginal tear. Without medical records from K.M.'s vaginal delivery, defendant's expert cannot say with any amount of certainty that it was a possible cause of K.M.'s vaginal tear. Because the proposed testimony would be purely speculative, the trial court did not abuse its discretion in barring it.

¶ 43    Next, defendant contends that his expert's proposed testimony did not fall under the rape-shield statute. The trial court has discretion to determine what evidence is to be barred under the rape shield statute. *People v. Pope*, 2020 IL App (4th) 180773, ¶ 28. A court's determination that evidence is to be barred under the rape shield statute is not to be reversed absent an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is arbitrary or when no reasonable person would take the view adopted by the trial court. *Id.* To the extent our analysis requires statutory interpretation, our review is *de novo*. *In re Marriage of Dynako*, 2021 IL 126835, ¶ 14.

¶ 44    "The rape shield statute absolutely bars evidence of the alleged victim's prior sexual activity and reputation, subject to two exceptions: (1) evidence of past sexual activities with the accused, offered as evidence of consent; and (2) where the admission of such evidence is constitutionally required." *People v. Starks*, 365 Ill. App. 3d 592, 600. Regarding the second exception, admission of such evidence is constitutionally required "where the exclusion of the evidence prevents the defendant from presenting his theory of the case." *Id.*

¶ 45    The rape shield statute is meant "to prevent the defendant from harassing and humiliating the complaining witness with evidence of either her reputation for chastity or specific acts of sexual conduct with persons other than [the] defendant." *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 42. However, the constitution does require that a defendant be allowed to present certain evidence *directly* relevant to matters at issue in the case, notwithstanding that it concerned the victim's prior sexual history. *People v. Lewis*, 2017 IL App (1st) 150070, ¶ 21 (Emphasis in original.) (citing *People v. Santos*, 211 Ill. 2d 395, 405-06). "Fairness *** does not require the admission of evidence which is only marginally relevant or which poses an undue risk of harassment, prejudice, or confusion of the issues." (Internal quotation marks omitted.) *Id.*

¶ 46    Here, as the State notes in its brief, K.M. would have been 17 or 18 at the time she became pregnant. She was likely unmarried. These factors lend themselves to creating an undue risk of harassment or prejudice. Pregnancy and childbirth, although not in and of themselves sexual activity, are a collateral consequence of sexual activity. See *People v. Carter*, 2022 IL App (1st) 210261 (barring evidence of STD treatment, a collateral consequence of sexual activity, pursuant to the rape shield statute). Most importantly, the proposed testimony regarding K.M.'s vaginal delivery is not directly relevant to the issues at hand and therefore could cause the jury to confuse the issues.

¶ 47    Further, neither exception to the rape shield statute applies. Defendant is not alleged to be the father of K.M.'s child. Therefore, the first exception does not apply. Nor is the admission of evidence related to K.M.'s prior vaginal delivery constitutionally required. Exclusion of evidence related to K.M.'s prior vaginal delivery did not prevent defendant from presenting his theory of the case—that there existed alternative explanations for the T.B. dye reuptake. *Supra ¶* 25-27, 33.

Accordingly, the trial court did not err in finding the proposed testimony fell under the rape shield statute.

¶ 48    Defendant's second argument is that the trial court erred by denying his discovery request for K.M.'s medical records from her vaginal delivery. In doing so, the trial court denied him due process. In support of this argument, he contends that the records were relevant and material. Therefore, they were subject to disclosure and a subpoena under Illinois Supreme Court Rule 412(c), (g), (h), and (e)(ii). The State responds that defendant's attempt to obtain K.M.'s medical records from her vaginal delivery amounted to an inappropriate "fishing expedition," and the trial court appropriately limited the scope of discovery.

¶ 49    The denial of a discovery request is subject to review under an abuse of discretion standard. *People v. Sauls*, 2022 IL 127732, ¶ 32. Further, the trial court has broad discretion in ruling on issues of relevance and materiality. *People v. Williams*, 267 Ill. App. 3d 82, 87. As discussed above, an abuse of discretion occurs when the trial court's ruling is arbitrary or when no reasonable person would take the view adopted by the trial court. *Pope*, 2020 IL App (4th) 180773, ¶ 28. The *de novo* standard of review applies to whether defendant was denied due process, and if that denial was prejudicial. *Sauls*, 2022 IL 127732, ¶ 32.

¶ 50    Leave to subpoena records will be granted where:

"(1) *** the documents are evidentiary and relevant; (2) *** [the documents] are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) *** the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) *** the application is made in good faith and is not intended as a

general 'fishing expedition.'" *People ex rel. Fisher v. Carey*, 77 Ill. 2d 259, 269 (quoting *United States v. Nixon*, 418 U.S. 683, 699-700).

Additionally:

> "[a] defendant who seeks to subpoena *** records of or concerning the victim that are confidential or privileged by law must seek permission of the court before the subpoena is issued. The defendant must file a written motion and an offer of proof regarding the relevance, admissibility, and materiality of the testimony or records. If the court finds by a preponderance of the evidence that:
>
> (i) the testimony or records are not protected by an absolute privilege and
>
> (ii) the testimony or records contain *relevant, admissible, and material evidence that is not available through other witnesses or evidence*, the court shall issue a subpoena requiring *** a sealed copy of the records be delivered to the court to be reviewed in camera." (Emphasis added.) 725 ILCS 120/4.5(9)(A) (West 2024).[2]

A finding of relevance, admissibility, and materiality are all necessary requirements before the trial court can issue a subpoena.

---

[2]In his reply brief, defendant argues that 725 ILCS 120/4.5(c-5)(9)(ii) is inapplicable here because neither the State or K.M. appealed within 30 days, pursuant to 725 ILCS 120/4.5(c-5)(14). Defendant is mistaken. The 30-day deadline is imposed where relief is *denied*. Here, the proper statutory protocol was followed, so it was unnecessary for the State or K.M. to request relief, so therefore, relief was not denied. Where a "Notice of Intent to Assert Victim's Rights" was filed on September 13, 2023, K.M. asserted her right to notice and hearing before disclosure of confidential or privileged information or records. Accordingly, the trial court was required to follow the statutory protocol outlined in 725 ILCS 120/4.5(c-5)(9)(ii) (West 2024).

¶ 51    Here, defendant failed to make a showing that K.M.'s medical records from her vaginal delivery would be admissible. Trial counsel even says as much: "There was a live birth two years ago *** it could have affected the interpretation of the results, and so it is relevant for her to come to a final opinion. And again, Judge, it's discoverable, *not necessarily admissible*."

¶ 52    Further, the evidence defendant was attempting to obtain through these medical records— an alternative explanation for the T.B. dye reuptake— was available through direct examination of defendant's expert, Tristan Wristen, and cross examination of the State's expert, Melissa Burke. Per the trial court's October 18, 2024, order: "The defendant shall be allowed to inquire with the defendant's expert the possible reasons TB Dye may reuptake ***" and "the defense shall be able to cross the People's expert as to her March 2024 opinion regarding the possible source of the vaginal tear. The People may cross examine the defense expert as to the surgical vaginal procedure not being the origin of the vaginal injury."

¶ 53    Notwithstanding the requirements of 725 ILCS 120/4.5(9)(A), defendant is unable to show that a subpoena should have been issued under the *People ex rel. Fisher v. Carey* standard. Namely, he cannot show that the discovery request was not intended as a general "fishing expedition." "Absent a showing of relevance, an order compelling discovery of the information sought by defendant would have amounted to nothing more than a fishing expedition." *People v. Williams*, 267 Ill. App. 3d 82, 87. Defendant contends that the requested records were relevant because the State's expert's changing opinions "put the possibility of alternative causes of T.B. dye reuptake squarely at issue. *Supra* ¶ 27. In other words, if K.M.'s vaginal surgical procedure from two weeks ago could cause T.B. dye reuptake, the birth of K.M.'s child could cause T.B. dye reuptake.

¶ 54    However, this ignores the very language of Melissa Burke's original opinion: "[T]he vaginal trauma observed would be consistent with vaginal penetration by her rapist. However, due

to the *recent* and prior medical procedure the victim disclosed to Nurse Burke, the vaginal trauma could also be consistent with the prior medical procedure." (Emphasis added.) The recency of K.M.'s surgical vaginal procedure was integral here. Additionally, Melissa Burke later amended her opinion to state that "the vaginal tear observed was an acute injury, occurring close in time to the assault, consistent with vaginal penetration. The vaginal tear observed would *not* be attributable to the surgical vaginal procedure that occurred approximately two weeks prior to the assault." (Emphasis in original.) When asked to explain this amendment, Melissa Burke testified that her original opinion was given without the benefit of her notes. When she had the notes to review, she amended her opinion in light of those. *Supra* ¶ 27. Even with Melissa Burke's changing opinion, the non-recent birth of K.M.'s child fails to meet the low bar of relevancy. "A trial court may reject evidence on the grounds of relevancy if it is remote, uncertain, or speculative." *People v. Cloutier*, 156 Ill. 2d 483, 501. Here, the trial court appropriately determined the remoteness of K.M.'s medical records from her vaginal delivery rendered the records irrelevant.

¶ 55     Defendant analogizes *People v. Sauls*, 2022 IL 127732, arguing that similarly to the defendant in *Sauls*, he "expressed a good-faith belief that his expert needed the obstetric medical records to render an opinion on the source of a vaginal tear, and ultimately penetration." However, *Sauls* is distinguishable. The records sought in *Sauls* were Department of Children and Family Services (DCFS) records pertaining to the mother of the victim and the mother's "live-in girlfriend." *Sauls*, 2022 IL 127732, ¶ 4. The same crime victims' rights that are at play in the instant case were not relevant in *Sauls*. Accordingly, we do not find defendant's reliance on *Sauls* persuasive.

¶ 56     Although we do not find any error occurred here, we will briefly address the parties' harmless error arguments. Even supposing that error *did* occur, it is well established that any

evidentiary error is harmless where the evidence in the case is so overwhelming that no reasonable fact finder would have acquitted the defendant absent the error. *People v. Coleman*, 2014 IL App (5th) 110274, ¶ 159. The State argues that the evidence of defendant's guilt was overwhelming, and the trial court's ruling did not prevent him from arguing his theory to the jury. Therefore, any error that occurred was harmless. Defendant, in response, argues that the State's claims are unsupported by the evidence, and also claims that "the evidence was close on every issue in this case." This response simply defies logic. The evidence of defendant's guilt was overwhelming. *Supra* ¶¶ 10-29, 38.

¶ 57    In arguing that the evidence was close on every issue, defendant relies heavily on his own testimony. For example, the State argues that the text messages between defendant and K.M. show defendant's consciousness of guilt. Relying on his own testimony, defendant argues in his reply brief that "K.M. was sending him text messages in quick succession, which were not all loading, and his apology was in response to a message where K.M. said he hurt her daughter by pushing her off." First, there was no text message in evidence where K.M. accuses defendant of hurting her daughter by pushing her off. Second, regarding defendant's claim that messages were failing to load—defendant testified that he only sent the text message "I apologize, I didn't mean no harm" one time, but it appeared three times on K.M.'s phone due to connectivity issues. However, this is refuted by the evidence. The initial text message was sent at 5:44 AM and read: "I apologize i [*sic*] didn't mean no harm." The second and third text messages were sent at 5:45 AM and read "I apologize I didn't mean no harm." *Supra* ¶ 13. This difference in capitalization of the second "I" directly refutes his testimony that he only sent that text once. Defendant's version of events regarding the text messages is simply implausible. There is no "credibility contest' where one party's version of events was implausible. *People v. Daniel*, 2018 IL App (2d) 160018, ¶ 30.

¶ 58 Defendant also argues that "he sent a message saying he did not rape her, but that message was not photographed on her phone." However, this does nothing to explain the two texts sent at 6:29 AM and 6:52 AM, wherein defendant says "I apologize i [*sic*] didn't mean to make you mad" and "I'm sorry I didn't mean to disrespect you." Both these texts show consciousness of guilt.

¶ 59 Further, defendant's testimony is simply not credible. He testifies that K.M. jumped on him while she was not wearing underwear and he was wearing basketball shorts. Again, there is no "credibility contest' where one party's version of events was either implausible or corroborated by other evidence. *Id.* Here, K.M.'s version of events is corroborated by other evidence, namely, the vaginal tear and the DNA analysis. *Supra* ¶¶ 22, 8-29. Accordingly, even if there *was* error, that error would be harmless, given the overwhelming evidence of defendant's guilt.

¶ 60 Defendant has failed to show that the trial court erred in barring his expert witness from identifying K.M.'s prior vaginal delivery as a possible cause of the vaginal tear or by denying his discovery request for K.M.'s medical records from her vaginal delivery. Accordingly, we affirm.

¶ 61                                        III. CONCLUSION

¶ 62 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 63 Affirmed.